**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PHOENIX LICENSING, L.L.C., an Arizona limited liability company, and LPL LICENSING, L.L.C., a Delaware limited liability company,<br><br>Plaintiffs,<br>v.<br><br>ADVANCE AMERICA, CASH ADVANCE CENTERS, INC.,<br><br>Defendant. | Case No. 2:15-cv-01367<br><br>**Jury Trial Demanded** |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

In this action for patent infringement, Plaintiffs Phoenix Licensing, L.L.C. ("Phoenix") and LPL Licensing, L.L.C. ("LPL") (collectively, "Plaintiffs") make the following allegations against Advance America, Cash Advance Centers, Inc. ( "Defendant").

**BACKGROUND**

1. LPL is 100% owned and controlled by the inventor of the patents-in-suit, Richard Libman.

2. Nearly twenty years ago, Mr. Libman began the process of patenting the inventions disclosed in the patents-in-suit, and thirteen other related patents (collectively, the "LPL patents"), based on his three decades of experience in sales and direct marketing.

3. During Mr. Libman's work in sales and direct marketing, he witnessed first-hand the drawbacks to existing computer systems and methods for assisting marketing agents. '317 Patent, 2:50-60. Telemarketers and agents worked with a limited universe of defined products and services, and worse, with limited information about them and about their customers. *Id*. at 3:18-29. Other problems included the inability to personalize communications effectively,

difficulty in generating those communications at volume, and the inability to adapt computerized or manual marketing systems to account for variations in products, product data, customer needs, and other inputs. *Id.* at 3:30-51. The result was an inability to market products to the retail middle market, which for insurance and financial products was underserved due to inadequate distribution methods in the industry.

4. Mr. Libman invented ways of overcoming these drawbacks. His inventions improved upon the then-available technology, enabled the production and generation of more effective communications, reduced costs, and ultimately resulted in higher response and conversion rates.

5. Mr. Libman disclosed his inventions to the public, had the claims repeatedly scrutinized on grounds of eligibility, novelty, nonobviousness, written description, and enablement by examiners at the U.S. Patent Office, had claims reconsidered on novelty and nonobviousness grounds in multiple reexamination proceedings, overcame hundreds of prior art references through prosecution and reexamination proceedings, paid and continues to pay filing and maintenance fees to the Patent Office, and was awarded the LPL patents. Because of those actions, the public has benefitted from Mr. Libman's disclosures, and each claim of each patent is statutorily protected by a presumption of validity that can be rebutted only by clear and convincing evidence.

6. The LPL patents consist of a single family of nineteen patents, examined by at least five different examiners and containing over 1,500 issued claims.

7. The LPL patents include the following patents-in-suit:

(a) Computerized apparatuses, methods, and systems that implement decision criteria, product information, and client information to automatically select and present products appropriate for the client via client communications (for example, a direct mail communication incorporating variable information) as described and claimed in United States Patent Number 5,987,434 entitled "Apparatus and Method for Transacting Marketing and

Sales of Financial Products" (the "'434 patent");

(b) Apparatuses, methods, and systems that automatically generate personalized communication documents for financial products or services, where the communications include personalized content that present alternative descriptions, characteristics and/or identifications associated with the financial product or service, as described and claimed in United States Patent Number 7,890,366 entitled "Personalized Communication Documents, System and Method for Preparing Same" (the "'366 patent");

(c) Apparatuses, methods, and system that use client information to automatically select financial products or services appropriate for the client and prepare personalized client communications offering the selected products, as described and claimed in United States Patent Number 8,352,317 entitled "System for Facilitating Production of Variable Offer Communications" (the "'317 patent");

(d) Apparatuses, methods, and systems that automatically generate customized communications offering financial products or services to a plurality of clients, and replies to client responses to such communications, as described and claimed in United States Patent Number 8,234,184 entitled "Automated Reply Generation Direct Marketing System" (the "'184 patent");

(e) Apparatuses, methods, and systems for automatically preparing customized replies in response to communications from a plurality of clients, as described and claimed in United States Patent Number 6,999,938 entitled "Automated Reply Generation Direct Marketing System" (the "'938 patent"); and

(f) Apparatuses, methods, and systems that automatically select products or services appropriate for the client and prepare personalized client communications relating to an offer for the selected products or services, as

described and claimed in U.S. Patent No. 8,738,435 entitled "Method and Apparatus for Presenting Personalized Content Relating to Offered Products and Services" (the "'435 patent") (hereafter, the above patents are collectively referred to as the "patents-in-suit").

8. The examiners who issued the LPL patents examined claims in parent and related applications, and repeatedly cited many prior art references, before satisfying themselves that the claims of the patents differed substantially from the paradigm of earlier technology.

9. During examination of the LPL patents, the U.S. Patent Office had access to and knowledge of the then-current state of the art and earlier technology. For the patents-in-suit alone, the materials cited on the face of the patents and considered by the examiners include thousands of U.S. patents and published applications, foreign patent documents, and non-patent marketing references.

10. The examiners also had outside assistance comparing the inventions to prior art. As reflected on the face of many of the LPL patents, the examiners considered claim charts and invalidity contentions prepared by litigants purporting to invalidate earlier-issued, related claims through a variety of prior art references.

11. Examination of the LPL patents has extended over nineteen years and continues today in pending patent applications.

12. Three of the LPL patents were confirmed, with no claims canceled, in reexaminations, and one of the three survived two successive reexaminations.

13. Four of the patents-in-suit (one pursuant to a reexamination certificate) issued after *Bilski v. Kappos*, 561 U.S. 593 (2010), and *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012). And although the examinations predated *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), that case applied the *Mayo* framework and stated that its holding "follows from our prior cases, and *Bilski* in particular …."

14. The claims of the LPL patents comprise meaningful, technological limitations that, when combined in the claims, define inventions that operate in a "new paradigm" compared to earlier ways to mass-market products.

15. During the prosecution history of the '317 patent, for instance, the examiner distinguished the inventions from the prior art by stating: "This [prior art] reference *is still firmly rooted in the one-on-one selling paradigm of insurance policies*, where an insurance agent sits down with a client and conducts an interview to gather the information needed or manually inputs information provided to the agent in a questionnaire" then "go[es] to many different insurance companies to request quotes … and conduct lengthy and time-consuming analyses to establish which was the best product for the customer." 06/20/12 '317 patent Office Action at 5.

16. Earlier systems were limited to certain specific products or product types and lacked the ability to select alternative financial products, '317 Patent, 3:20-26, typically required the attention of and interaction with an agent or telemarketer to gather and input client information, and to aid in the selection of products for presentation to the client, *id*. at 3:26-29, had an important drawback of the limited extent to which they could personalize the presentation letter or other communications, *id*. at 3:30-32, were limited in their ability to process large volumes of prospective client communications, *id*. at 3:42-43, required "human input and decision making as a necessary part of their operation, *id*. at 3:45-46, and were relatively unsophisticated in nature, *id*. at 3:46-47.

17. Earlier systems were technically incapable of the customization described and claimed in the LPL patents and thus could not support the marketing of products that benefit from individualized customization or design. Instead, mass-mailer systems produced output that was either non-customized or just customized to address a given person, or simply facilitated data entry by agents. Such systems could not select which product and what product characteristics were appropriate for a given person, and selection modules were disaggregated from communication assembly modules.

18. Other ways of communicating offers to consumers that were distinct and not preempted by Mr. Libman's inventions included, for example, a prior art reference to Ryan, that appears on the face of, and was addressed during the prosecution history of, many of the LPL patents.

19. In considering the Ryan reference in the context of his inventions, Mr. Libman explained during the prosecution history of an LPL patent, that:

> [N]o product or product characteristics have been predetermined [in the claimed invention] to offer any of the clients. One or more databases contain data which is used to create a custom offer for a particular client; however, the product data does not exist as discrete products, rather the product data exists as pieces of data (i.e., product characteristics) to makeup any particular product…. The system uses decision criteria applied against client data and financial product data to first determine whether a product should be offered to a particular client.

11/2/09 U.S. Patent No. 7,711,599 Remarks at 46. Mr. Libman further explained that, in contrast, "Ryan does not possess this decision-making ability." *Id*. at 45.

20. Beyond merely automating an agent's work, the inventions of the LPL patents determine and/or compare client needs with various available products to solve needs, select and/or recommend products appropriate for the needs of each client, and prepare personalized and individualized correspondence tailored for each client to effectively communicate the information to the client so that he or she may make an informed buying decision.

21. The LPL patents go beyond simply describing a way to computerize a manual process. They describe a process of choosing product characteristics, or customizing products, for a specific individual based on his or her specific needs, using decision criteria, then creating customized offer communications from same, all in a mass-produced way.

22. Companies looking for better options used, and lauded, Mr. Libman's inventions. The Vice President for Alternative Distribution at Assurant Group wrote that "Mr. Libman's inventions were not available anywhere else in the market at the time," and "the technology could solve … distribution problem[s] and do so cost effectively." 8/14/08 '434 Reexamination Pursley Decl. ¶7. The CEO of KeyCorp wrote that he "recognized that [the] technology could

profitably solve the problem of high volume insurance product distribution to the middle-market." 8/14/08 '434 Reexamination Jarvis Decl. ¶6. And the President and CEO of FirstMerit wrote that "the technology … enabled [FirstMerit] to market the appropriate product to each customer and produce a personalized solicitation based on the customer's exact profile (i.e., not general demographics) and the financial product's information." 8/13/08 '434 Reexamination Larmer Decl. ¶7.

23. News and trade publications reported on the advantages of Mr. Libman's inventions. Bank Investment Product News, for instance, described Mr. Libman's technology as "the first of its kind" and resulting in improved response and conversion rates:

**Bank Investment Product News**

A PUBLICATION OF INSTITUTIONAL INVESTOR, INC.

VOL. III, NO. 15 APRIL 21, 1997

### FIRSTMERIT OFFERS CUSTOMIZED INSURANCE QUOTES WITH CHECKING STATEMENTS.

**FirstMerit Insurance Agency** is mining its checking account database for insurance sales by providing customized quotes to checking customers with their statements. The term life insurance quotes are based on the demographic information that is connected to the accounts. **Felice Larmer**, president of **FirstMerit Corp.**'s insurance subsidiary, says the first mailing went to more than 130,000 customers between the ages of 20 and 55. Next month, a second promotion will go after checking customers who are older than 55.

The promotion—FirstMerit's first ever for insurance—uses technology from Santa Monica, Calif.-based **I.C.A. Insurance Marketing**. It is believed to be the first of its kind; I.C.A. developed the ability to generate the quotes from the checking information early this year.

The mailing went out last month. FirstMerit Insurance is projecting a 0.604% response rate on the 20-to-55 promotion, which is offering **Old Line Life Insurance**, Larmer says. This figure is at least double the response garnered by other top bank programs, which range from 0.2% to 0.3%, says **Kenneth Kehrer**, president of **Kenneth Kehrer Associates**. Though the response rate has been high, the true measure of program success will be in the conversion rate, Kehrer says, adding that top programs have been able to turn anywhere from 13% to 20% of respondents into customers. It is too early for FirstMerit to project a conversion rate, Larmer says.

FirstMerit is already showing signs of a high conversion rate, however, as 55 of 360 callers—about 15% of responses to date—wanted to purchase the term insurance right off the preliminary mailing. That surprised Larmer, who expected the sales to be generated from follow-up mailings and phone calls. She attributes the strong numbers to the fact that the promotion offers a specific cost for insurance, not an estimated price. About half of the callers asked for spousal quotes, she adds.

Larmer and **Richard Libman**, president and ceo of I.C.A. would not quantify the costs of the promotion. But Libman notes that the costs are minimized because there is no need for a mailing that is separate from the checking statement. Libman says a million-piece mailing costs $10,000 plus annual royalty and licensing fees. He would not disclose these fees.

Akron, Ohio-based FirstMerit wanted a program to target middle-market customers. Larmer believes the upscale market is overserved, pointing to industry data which says that as much as 40% of the premiums are paid by 5% of the population. She asserts that the middle market is where banks can carve out a sizable niche of insurance sales. "Most agents aren't going to go after a 20-year-old," she says.

I.C.A. is negotiating with other banks to use its system. I.C.A. is not affiliated with **Investment Centers of America**, another firm in the bank investment industry.

—*Steven Goldstein*

24. Other publications, as depicted below for example, described Mr. Libman's patented technology as enabling institutions to profitably market their products, reach multiple customers with one-to-one, targeted solicitations, avoid the high costs associated with direct mail and telemarketing, and offer customers appropriate products. As FISI-Madison Financial's Chief Marketing Officer acknowledged, through the use of Mr. Libman's technology, FISI-Madison Financial was able to "reach the right people, at the right time with the right offer."

**FISI-MADISON FINANCIAL TEAMS WITH ICA TECHNOLOGIES TO MARKET INSURANCE OFFERINGS**

**NASHVILLE, Tenn. (April 18, 2001)** – FISI-Madison Financial and ICA Technologies, Inc. have teamed up to offer insurance products through ICA's new Individualized Statement Marketing process.

"We are delighted to partner with FISI-Madison ," said Richard M. Libman, chief executive officer of ICA . "This partnership will greatly enhance their client institutions' reach to large customer bases, while safeguarding customer information."

ICA's patented technology, known as Individualized Statement Marketing, enables financial institutions to profitably market financial, insurance and other fee income products to customers right on their monthly account statements. Institutions can now reach multiple customers with one-to-one, targeted solicitations, avoiding the high costs normally associated with direct mail and telemarketing. The Individualized Statement Marketing process is in full compliance of federal privacy regulations.

"In addition to helping community and large financial institutions realize additional fee income opportunities, ICA's customization features ensure customers are offered the appropriate products," said Shawn D. Morris, chief marketing officer for FISI-Madison Financial. "Partnering with ICA gives us another way to reach the right people, at the right time with the right offer. Just as important, it further positions ICA and FISI-Madison Financial as leaders in the direct marketing of insurance products to financial institution customers."

25. The LPL patents have been cited as prior art by thousands of other companies. United States Patent Number 5,987,434 alone has been cited as prior art by over 470 companies, including household names such as JPMorgan Chase Bank, Accenture, Verisign, IBM, Oracle, Bank One Delaware, Charles Schwab, Thomson Reuters, Travelers Indemnity, PNC Financial, First USA, Microsoft, and AT&T.

26. Phoenix is the owner of the patents-in-suit. Pursuant to a license agreement dated December 1, 2006, Phoenix granted LPL an exclusive licensee of the patents-in-suit.

27. Defendant has been and is now infringing the patents-in-suit by making, using, offering for sale, selling, and/or importing products covered by one or more claims of the patents-in-suit without Plaintiffs' permission.

28. Defendant makes and uses products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers that infringe the patents-in-suit.

29. On information and belief, Defendant generated the following communications using technology claimed in the patents-in-suit. On information and belief, the communications depicted below were sent in 2015 to different consumers, and the offers to such consumers were customized based on one or more of the consumer's address, income, or age. Consumer A is offered cash advances up to $600, title loans up to $10,000, installment loans up to $1,200, online loans up to $2,250, and $25 in cash. Consumer B, in contrast, is offered only cash advances up to $500, and title loans up to $5,000. Consumer C is simply offered cash advances.

**Consumer A**




**Consumer B**



**Consumer C**




30. Based on third party data that tracks direct mail, email, print and mobile advertising in the United States, on information and belief, Defendant has sent an estimate of hundreds of millions of direct mail and email marketing communications between 2005 and 2014. On information and belief, several million of such direct mail communications were sent to addresses located in this District.

31. LPL has collected and analyzed many of Defendant's communications to determine that Defendant produced and/or generated such communications using technology claimed in the patents-in-suit.

32. Plaintiffs seek monetary damages for Defendant's infringement and a permanent injunction prohibiting Defendant from continuing to infringe the patents-in-suit.

**PARTIES**

33. Phoenix is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona.

34. LPL is a Delaware limited liability company with its principal place of business in Scottsdale, Arizona, and personnel in Tyler, Texas.

35. Upon information and belief, Advance America, Cash Advance Centers, Inc. is a Delaware corporation with its principal place of business in Spartanburg, South Carolina.

**JURISDICTION AND VENUE**

36. This action arises under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, including § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

37. This Court has personal jurisdiction over Defendant because, among other reasons, Defendant has done business in this District, and has committed and continues to commit acts of patent infringement in this District.

38. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b) because, among other reasons, Defendant is subject to personal jurisdiction in this District, and has committed and continues to commit acts of patent infringement in this District.

**COUNT I**

**INFRINGEMENT OF U.S. PATENT NO. 5,987,434**

39. Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

40. On November 16, 1999, the United States Patent and Trademark Office issued the ’434 patent for inventions covering the following marketing technology: computerized apparatuses, methods, and systems that implement decision criteria, product information, and client information to automatically select and present products appropriate for the client (for example, a direct mail communication incorporating variable information), as described and claimed in the ’434 patent. Phoenix is the owner by assignment of all right, title, and interest in the ’434 patent, including all rights to pursue and collect damages for past infringements of the patent. LPL is the exclusive licensee of the ’434 patent. A true and correct copy of the ’434 patent is attached as Exhibit A.

41. Defendant has been and is now directly infringing one or more claims of the ’434 patent, in this judicial District and elsewhere in the United States, by, among other things, making and using products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers. These materials contain, for example, customized notices and offers concerning cash advances, title loans, installment loans, and online loans.

42. On information and belief, Defendant selects financial products for customers or potential customers.

43. On information and belief, Defendant presents and/or offers financial products to customers or potential customers.

44. On information and belief, Defendant stores information about customers or potential customers.

45. On information and belief, Defendant stores information about financial products.

46. On information and belief, Defendant offers financial products to customers or potential customers by using decision criteria or other rules or parameters.

47. On information and belief, Defendant offers financial products to customers or potential customers based on information about the customers or potential customers, and financial products, and decision criteria.

48. On information and belief, Defendant prepares direct mail for its customers or potential customers that offer financial products based on information about the customers or potential customers, and financial products, and decision criteria.

49. Defendant has committed these acts of infringement without license or authorization.

50. By engaging in the conduct described herein, Defendant has injured Plaintiffs and is thus liable for infringement of the ’434 patent under 35 U.S.C. § 271.

51. As a result of Defendant’s infringement of the ’434 patent, Plaintiffs have been damaged and are entitled to a money judgment in an amount adequate to compensate for

Defendant's infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

52. Plaintiffs have also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendant, its agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the '434 patent.

53. To the extent that facts learned in discovery show that Defendant's infringement of the '434 patent is or has been willful, Plaintiffs reserve the right to request such a finding at the time of trial.

**COUNT II**

**INFRINGEMENT OF U.S. PATENT NO. 7,890,366**

54. Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

55. On February 15, 2011, the United States Patent and Trademark Office issued the '366 patent for inventions covering the following marketing technology: apparatuses, methods, and systems that automatically generate personalized marketing communications for financial products or services, where the communications include personalized content that present alternative descriptions, characteristics and/or identifications associated with the financial product or service, as described and claimed in the '366 patent. Phoenix is the owner by assignment of all right, title, and interest in the '366 patent, including all rights to pursue and collect damages for past infringements of the patent. LPL is the exclusive licensee of the '366 patent. A true and correct copy of the '366 patent is attached as Exhibit B.

56. Defendant has been and is now directly infringing one or more claims of the '366 patent, in this judicial District and elsewhere in the United States, by, among other things, making and using products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers. These

materials contain, for example, customized notices and offers concerning cash advances, title loans, installment loans, and online loans.

57. On information and belief, Defendant prepares personalized direct mail for its customers or potential customers.

58. On information and belief, Defendant provides information about financial products or services to its customers or potential customers.

59. On information and belief, information about financial products or services that Defendant provides to its customers or potential customers may vary.

60. On information and belief, Defendant provides alternative descriptions of the financial products or services that Defendant provides to its customers or potential customers.

61. On information and belief, Defendant does not prepare marketing communications for its customers or potential customers by hand.

62. On information and belief, the system(s) used by Defendant to prepare marketing communications for its customers or potential customers is, or at least in part is, automated.

63. On information and belief, Defendant successively prepares marketing communications for its customers or potential customers.

64. On information and belief, Defendant personalizes its marketing communications for its customers or potential customers.

65. On information and belief, personalized marketing communications that Defendant sends its customers or potential customers may contain information that varies between the customers or potential customers.

66. On information and belief, marketing communications that Defendant sends its customers or potential customers may contain information about financial products or services that varies between the customers or potential customers.

67. Defendant has committed these acts of infringement without license or authorization.

68. By engaging in the conduct described herein, Defendant has injured Plaintiffs and is thus liable for infringement of the ’366 patent under 35 U.S.C. § 271.

69. As a result of Defendant’s infringement of the ’366 patent, Plaintiffs have been damaged and are entitled to a money judgment in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

70. Plaintiffs have also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendant, its agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the ’366 patent.

71. To the extent that facts learned in discovery show that Defendant’s infringement of the ’366 patent is or has been willful, Plaintiffs reserve the right to request such a finding at the time of trial.

**COUNT III**

**INFRINGEMENT OF U.S. PATENT NO. 8,352,317**

72. Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

73. On January 8, 2013, the United States Patent and Trademark Office issued the ’317 patent for inventions covering the following marketing technology: apparatuses, methods, and system that use client information to automatically select financial products or services appropriate for the client and prepare personalized client communications offering the selected products, as described and claimed in the ’317 patent. Phoenix is the owner by assignment of all right, title, and interest in the ’317 patent, including all rights to pursue and collect damages for past infringements of the patent. LPL is the exclusive licensee of the ’317 patent. A true and correct copy of the ’317 patent is attached as Exhibit C.

74. Defendant has been and is now directly infringing one or more claims of the ’317 patent, in this judicial District and elsewhere in the United States, by, among other things,

making and using products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers. These materials contain, for example, customized notices and offers concerning cash advances, title loans, installment loans, and online loans.

75. On information and belief, Defendant produces communications for customers or potential customers that contain different product-related information.

76. On information and belief, Defendant uses a computer system to automatically, or at least in part automatically, produce marketing communications for customers or potential customers.

77. On information and belief, Defendant selects product-related information to include in marketing communications for customers or potential customers.

78. On information and belief, customers or potential customers may receive different information about the same products in the marketing communications generated by Defendant.

79. On information and belief, Defendant selects product-related information for customers or potential customers based on one or more of personal data, product data, or selection criteria.

80. On information and belief, Defendant generates marketing communications for customers or potential customers that contain offers for products.

81. On information and belief, Defendant generates marketing communications for customers or potential customers that contain common and variable portions.

82. On information and belief, marketing communications generated by Defendant contain variable portions that differ between customers or potential customers.

83. On information and belief, marketing communications generated by Defendant contain variable portions that contain product-related information.

84. Defendant has committed these acts of infringement without license or authorization.

85. By engaging in the conduct described herein, Defendant has injured Plaintiffs and is thus liable for infringement of the ’317 patent under 35 U.S.C. § 271.

86. As a result of Defendant’s infringement of the ’317 patent, Plaintiffs have been damaged and are entitled to a money judgment in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

87. Plaintiffs have also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendant, its agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the ’317 patent.

88. To the extent that facts learned in discovery show that Defendant’s infringement of the ’317 patent is or has been willful, Plaintiffs reserve the right to request such a finding at the time of trial.

## COUNT IV

## INFRINGEMENT OF U.S. PATENT NO. 8,234,184

89. Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

90. On July 31, 2012, the United States Patent and Trademark Office issued the ’184 patent for inventions covering the following marketing technology: apparatuses, methods, and systems that automatically generate customized communications offering financial products or services to a plurality of clients, and replies to client responses to such communications, as described and claimed in the ’184 patent. Phoenix is the owner by assignment of all right, title, and interest in the ’184 patent, including all rights to pursue and collect damages for past infringements of the patent. LPL is the exclusive licensee of the ’184 patent. A true and correct copy of the ’184 patent is attached as Exhibit D.

91. Defendant has been and is now directly infringing one or more claims of the ’184 patent, in this judicial District and elsewhere in the United States, by, among other things,

making and using products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers. These materials contain, for example, customized notices and offers concerning cash advances, title loans, installment loans, and online loans.

92. On information and belief, Defendant creates communications for clients or potential clients

93. On information and belief, marketing communications are sent to clients or potential clients by Defendant.

94. On information and belief, a processor is used to create marketing communications sent by Defendant.

95. On information and belief, a database is used to create marketing communications sent by Defendant.

96. On information and belief, marketing communications sent by Defendant offer a product or service.

97. On information and belief, marketing communications sent by Defendant include an internet address.

98. On information and belief, marketing communications sent by Defendant include an internet address that is associated with a website that is viewable on a display.

99. On information and belief, Defendant receives responses from clients or potential clients via a website.

100. On information and belief, responses from clients or potential clients via a website are received by Defendant.

101. On information and belief, responses from clients or potential clients via a website associated with Defendant are in response to an offer.

102. On information and belief, clients or potential clients can respond to Defendant by selecting choices on a website associated with Defendant.

103. On information and belief, marketing communications sent by Defendant may include data obtained from a database.

104. On information and belief, marketing communications sent by Defendant may include variable data.

105. On information and belief, marketing communications by Defendant are delivered to clients or potential clients.

106. On information and belief, Defendant replies to responses from clients or potential clients received from a website associated with Defendant.

107. Defendant has committed these acts of infringement without license or authorization.

108. By engaging in the conduct described herein, Defendant has injured Plaintiffs and is thus liable for infringement of the ’184 patent under 35 U.S.C. § 271.

109. As a result of Defendant’s infringement of the ’184 patent, Plaintiffs have been damaged and are entitled to a money judgment in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

110. Plaintiffs have also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendant, its agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the ’184 patent.

111. To the extent that facts learned in discovery show that Defendant’s infringement of the ’184 patent is or has been willful, Plaintiffs reserve the right to request such a finding at the time of trial.

## COUNT V

## INFRINGEMENT OF U.S. PATENT NO. 6,999,938

112. Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

113. On February 14, 2006, the United States Patent and Trademark Office issued the '938 patent for inventions covering the following marketing technology: apparatuses, methods, and systems for automatically preparing customized replies in response to communications from a plurality of clients, as described and claimed in the '938 patent. Phoenix is the owner by assignment of all right, title, and interest in the '938 patent, including all rights to pursue and collect damages for past infringements of the patent. LPL is the exclusive licensee of the '938 patent. A true and correct copy of the '938 patent is attached as Exhibit E.

114. Defendant has been and is now directly infringing one or more claims of the '938 patent, in this judicial District and elsewhere in the United States, by, among other things, making and using products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for its customers and potential customers. These materials contain, for example, customized notices and offers concerning cash advances, title loans, installment loans, and online loans.

115. On information and belief, Defendant offers financial products to select consumers.

116. On information and belief, Defendant determines whether certain consumers are suitable to receive offers for financial products.

117. On information and belief, Defendant automatically, or at least in part automatically, prepares marketing communications that offer financial products or services.

118. On information and belief, Defendant sends marketing communications to consumers that include offers for a financial product or service.

119. On information and belief, Defendant receives responses to its marketing communications from consumers.

120. On information and belief, Defendant receives responses to its marketing communications from consumers that do not include a request to purchase a financial product or service.

121. On information and belief, Defendant automatically, or at least in part automatically, generates replies to requests from consumers that are not requests to purchase a financial product or service.

122. On information and belief, Defendant generates replies to consumers that are customized.

123. On information and belief, Defendant communicates replies to consumers who have requested information that does not include a request to purchase a financial product or service.

124. Defendant has committed these acts of infringement without license or authorization.

125. By engaging in the conduct described herein, Defendant has injured Plaintiffs and is thus liable for infringement of the ’938 patent under 35 U.S.C. § 271.

126. As a result of Defendant’s infringement of the ’938 patent, Plaintiffs have been damaged and are entitled to a money judgment in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

127. Plaintiffs have also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendant, its agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the ’938 patent.

128. To the extent that facts learned in discovery show that Defendant’s infringement of the ’938 patent is or has been willful, Plaintiffs reserve the right to request such a finding at the time of trial.

## COUNT VI

## INFRINGEMENT OF U.S. PATENT NO. 8,738,435

129. Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

130. On May 27, 2014, the United States Patent and Trademark Office issued the '435 patent for inventions covering the following marketing technology: apparatuses, methods, and systems that automatically select products or services appropriate for the client and prepare personalized client communications relating to an offer for the selected products or services, as described and claimed in the '435 patent. Phoenix is the owner by assignment of all right, title, and interest in the '435 patent, including all rights to pursue and collect damages for past infringements of the patent. LPL is the exclusive licensee of the '435 patent. A true and correct copy of the '435 patent is attached as Exhibit F.

131. Defendant has been and is now directly infringing one or more claims of the '435 patent, in this judicial District and elsewhere in the United States, by, among other things, making and using products and services that generate customized marketing materials, such as letters, e-mails, and other communications, for Defendant's customers and potential customers, as described and claimed in the '435 patent. These materials contain, for example, customized notices and offers concerning cash advances, title loans, installment loans, and online loans.

132. On information and belief, Defendant generates personalized communications for client or potential clients.

133. On information and belief, Defendant uses a system that automatically, or at least in part automatically, generates marketing communications.

134. On information and belief, Defendant uses a system that automatically, or at least in part automatically, successively generates marketing communications.

135. On information and belief, Defendant generates marketing communications that includes personalized content relating to an offer.

136. On information and belief, marketing communications sent by Defendant include alternative information about products or services offered by Defendant.

137. Defendant has committed these acts of infringement without license or authorization.

138. By engaging in the conduct described herein, Defendant has injured Plaintiffs and is thus liable for infringement of the ’435 patent under 35 U.S.C. § 271.

139. As a result of Defendant’s infringement of the ’435 patent, Plaintiffs have been damaged and are entitled to a money judgment in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

140. Plaintiffs have also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendant, its agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the ’435 patent.

141. To the extent that facts learned in discovery show that Defendant’s infringement of the ’435 patent is or has been willful, Plaintiffs reserve the right to request such a finding at the time of trial.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief from this Court:

A. A judgment in favor of Plaintiffs that Defendant has infringed the patents-in-suit;

B. A permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringing of the patents-in-suit, or such other equitable relief the Court determines is warranted;

C. A judgment and order requiring Defendant to pay Plaintiffs their damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant’s infringement of the patents-in-suit as provided under 35 U.S.C. § 284;

D. A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiffs their reasonable attorneys’ fees against Defendant;

E. A judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Plaintiffs, including without limitation, pre-judgment and post-judgment interest; and

F. Any and all other relief to which Plaintiffs may be entitled.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury of any issues so triable by right.

Dated: September 1, 2015

RUSS AUGUST & KABAT

/s/ *Marc A. Fenster*
Marc A. Fenster (CA SBN 181067)
Benjamin T. Wang (CA SBN 228712)
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991
mfenster@raklaw.com
bwang@raklaw.com

*Attorneys for Plaintiffs Phoenix Licensing, L.L.C. and LPL Licensing, L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on September 1, 2015 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ *Marc. A. Fenster*____
Marc A. Fenster