# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |  |
|---|---|---|
| PHOENIX LICENSING, L.L.C. ET AL., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 2:15-CV-1367-JRG-RSP LEAD CASE |
| ADVANCE AMERICA, ET AL. | § § § | |
| *Defendants.* | § § § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

On June 30, 2016, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent Nos. 5,987,434 ("the '434 Patent"); 6,999,938 ("the '938 Patent"); 8,234,184 ("the '184 Patent"); 7,890,366 ("the '366 Patent"); 7,860,744 ("the '744 Patent"); 8,606,632 ("the '632 Patent"); 8,352,317 ("the '317 Patent"); 8,738,435 ("the '435 Patent"); and 7,856,375 ("the '375 Patent") (collectively, the "Asserted Patents"). The Court has considered the arguments made by the parties at the hearing and in their claim construction briefs. (Dkt. Nos. 114, 116, & 118). The Court has also considered the intrinsic evidence and made subsidiary factual findings about the extrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The Court issues this Claim Construction Memorandum and Order in light of these considerations.

# TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................ 4

II.   APPLICABLE LAW ....................................................................................... 10

III.  CONSTRUCTION OF AGREED TERMS ................................................... 16

IV.   CONSTRUCTION OF DISPUTED TERMS ............................................... 18

1.    "distinct choices" ........................................................................ 19

2.    "client," "consumer entity," "person" ........................................ 21

3.    "client identifications" ................................................................ 26

4.    "[alternative / distinct / separate] descriptions, characteristics and/or identifications [associated with / for] [the offer[ing] / at least a first financial product and/or financial service]" ...................................................................... 30

5.    "[personalized notice / information] [concerning / relating to an offering for] said [first / at least one] financial product or service" ........................................ 33

6.    "automatically generat[e/ing] … communication data outputs for a plurality of clients … wherein the communication data outputs comprise at least two components" .............................................................................. 37

7.    "executing a first software routine via the at least one processor coupled to said first database and configured to automatically and without human intervention prepare a first electronic communication" ...................................... 40

8.    "client database," "database containing [client/customer] information," "database of available [clients / persons]" .......................................................... 42

9.    "each reply" .................................................................................. 45

10.   "distinct choices particular to the offering" ................................ 47

11.   "responses [… being in response to [said] [combined] [mass marketing] communications [relating to offerings for one or more financial products or services]," "responsive communications from the certain clients to the offerings," "responsive communication data outputs are composed using at least certain variable data specific to the certain clients," "the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients" .............................................................. 50

12.   "compliance and/or regulatory" ................................................... 58

13.    "data outputs comprise [of] at least two components" ................................ 60

14.    "other than one or more of [name, address and account number]" ............ 63

15.    "particular type of [financial] product or service," "particular type of [financial] product or service [or variant thereof]" ................................................ 66

16.    "financial product[s] [and/or] [financial] services" ................................... 70

17.    "automatic[ally]" ........................................................................................ 77

18.    "financial" when used in the preamble ....................................................... 82

19.    "plan" .......................................................................................................... 83

20.    "products [or services]" .............................................................................. 86

21.    "means . . . for using" ................................................................................ 91

22.    "means for preparing," "means for automatically preparing," "means for automatically generating," .............................................................................. 97

23.    "means for communicating" ..................................................................... 103

24.    "means for inputting" ............................................................................... 106

25.    "means for receiving" ............................................................................... 113

V.    CONCLUSION ..................................................................................................... 116

## I. BACKGROUND

### A. Overview of the Apparatus and Methods Disclosed in the Asserted Patents

The Asserted Patents generally relate to an apparatus and method for marketing financial products such as individual insurance policies. '434 Patent at 1:7–9. More specifically, the specification states that the Asserted Patents relate "to apparatus and methods for marketing such products in a fully automated or significantly automated manner to achieve high volumes of transactions and sales in a short period of time." *Id.* at 1:9–12. In describing the prior art, the specification states that known automated systems were "limited largely if not entirely to one of two major types (term of [sic] permanent) of product, i.e., term life insurance," and lacked the ability to select alternative financial products. *Id.* at 2:65–3:4. The specification continues that the known systems "typically require the attention of and interaction with the agent or telemarketer to gather and input the lead client information, and to aid in the selection of the most advantageous products for presentation to the client." *Id.* at 3:4–8. The specification also states that "[a]nother important drawback of such known systems is the limited extent to which they personalize the presentation letter or other communications." *Id.* at 3:9–11.

The specification further characterizes the prior art systems as being "limited in their ability to process large volumes of prospective client communications." *Id.* at 3:21–23. The specification states that "[t]his is attributable in large part to their requirement for human input and decision making as a necessary part of their operation, and because of the relatively unsophisticated nature of the known systems." *Id.* at 3:23–26. The specification concludes the description of the prior art by stating that "[a]ll of these methods and systems have been limited in that they require a substantial amount of human involvement." *Id.* at 3:28–30.

With this background, the specification states that the object of the invention is to provide an apparatus and method for transacting financial product marketing and sales that is: (1)

capable of being highly automated; (2) capable of processing relatively large volumes of client communications efficiently; (3) relatively cost effective compared to prior approaches; and (4) more personalized and individualized to individual prospective clients relative to prior approaches. To accomplish these objectives, the specification discloses the apparatus illustrated in Figure 1.



'434 Patent at Figure 1. In describing Figure 1, the specification states that this "embodiment comprises a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations." *Id.* at 6:2–5. The specification adds that "each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse 22, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24." *Id.* at 6:10–14. The specification further states that "[t]he processor of each computer node (server or workstation) includes a central processing unit (CPU) 26, random access memory (RAM) 28, and at least one mass storage device 30." *Id.* at 6:15–18.

In further describing processor 12, the specification states that the processor "has resident within its memory system computer software," which "has a 'core' system for transacting financial product marketing, and an 'administrative and support' system for supporting the core

system, facilitating the marketing program, providing administrative and management reports and functions, and preferring other tasks." *Id.* at 7:14–22. The specification states that "[t]he core system includes a plurality of modules, including a data input module, a database module, a Virtual Agent™ module, and a sales presentation and output module." *Id.* at 7:22–25. The specification also describes that "[t]he administrative and support system includes a production and scheduling module, a sales and financial report and analysis module, a telemarketing module, a communications interface module, and an automated agency and new business processing module." *Id.* at 7:25–29. The specific systems and modules will be discussed in more detail below as they relate to a disputed term/phrase.

### B. Overview of the Asserted Patents

Plaintiffs brings suit alleging infringement of ten patents in a related family. The '434 Patent is the parent of the family, with several of the Asserted Patents relating to the '434 Patent through continuation-in-parts and continuations. All of the Asserted Patents claim priority to the '434 Patent filing date. The following chart lists the filing date and issue date for each Asserted Patent in the family.

| Patent No. | Date Filed | Date Issued |
|---|---|---|
| '434 Patent | 6/10/1996 | 11/16/1999 |
| '938 Patent | 7/16/1999 | 2/14/2006 |
| '184 Patent | 7/15/2005 | 7/31/2012 |
| '366 Patent | 12/22/2006 | 2/15/2011 |
| '744 Patent | 4/27/2007 | 12/28/2010 |
| '632 Patent | 8/9/2010 | 12/10/2013 |
| '317 Patent | 4/6/2012 | 1/8/2013 |
| '435 Patent | 12/9/2013 | 5/27/2014 |
| '375 Patent | 12/29/2006 | 12/21/2010 |

Turning first to the '434 Patent, it is titled "Apparatus and Method for Transacting Marketing and Sales of Financial Products." The Abstract of the '434 Patent states the following:

An apparatus and method which use client information to automatically

select and present financial products appropriate for the client. The apparatus according to one aspect includes an input device for inputting client information, financial product information, ancillary data, and decision criteria; a storage device for storing the inputted items; decision making logic circuitry for using the inputted items to select a subset of the financial products; and an output device for preparing a client communication which identifies the subset of the financial products. The output device incorporates a portion of the client information and a portion of the financial products information into the client communication. The method according to one aspect includes inputting the same items; storing these inputted items; using the stored items to select a subset of the financial products; and preparing a client communication which identifies the subsets of the inputted information and incorporates it into the client communication.

'434 Patent at Abstract. Claim 22 is representative of the asserted claims of the '434 Patent and recites the following elements (disputed terms in italics):

22. An apparatus for using client information about clients to *automatically* select and present *financial products* appropriate for *each* of the clients, the apparatus comprising:

   *means for inputting* the client information, information about the *financial products*, a plurality of *plans each* of which includes at least one of the *financial products*, and decision criteria pertaining to selection from among the *plans*; wherein said *means for inputting* the client information is adapted to automatically input the client information without human intervention between input of respective client records;

   means operatively coupled to the inputting means for storing the client information, the *financial products* information, the *plans*, and the decision criteria;

   means operatively coupled to the storing means for using the client information, the *financial products* information, the *plans* and the decision criteria to select a subset of the *plans* for *each* of the clients appropriate for that client, the subset of the *plans* including at least one *plan* comprising a plurality of the *financial products*; and

   *means for preparing* a client communication for *each* of the clients which identifies the subset of the *plans* for that client.

The '744 Patent, the '317 Patent, the '366 Patent, the '375 Patent, the '632 Patent, and the '435 Patent generally share a common specification. Claim 28 of the '744 Patent is representative of the asserted claims and recites the following elements (disputed terms in

italics):

28. A method for *automatically* providing personalized notices concerning one or more *financial products or services* over an electronic network, the method utilizing at least one processor comprising the steps of:
 a) providing a first database containing *financial product or service* content associated with at least one *financial produc*t or service;
 b) executing a first software routine via the processor coupled to said first database and configured to *automatically* and without human intervention prepare a first electronic communication for a plurality of clients suitable for transmission over an electronic network, said first electronic communication comprising information relating to an *offering* for said at least one *financial product or service*; said first electronic communication comprising in part at least instructions relating to a first electronic communication *response* option;
 c) executing a second software routine by the processor configured to receive one or more variable electronic communication *responses* from certain clients based on said certain clients selecting said at least one electronic communication *response* option;
 d) providing a second database containing client information for said certain clients who are also existing clients, said client information including both client identification information and client account information for said at least one *financial product or service*;
 e) generating *variable information* for said certain clients relating to said *financial product or service*, which *variable information* varies from one client to another client based on said one or more variable electronic communication *responses* received from at least one of said certain clients;
 f) executing a third software routine by the processor coupled to said second database and configured to *automatically* and without human intervention prepare a second electronic communication for said certain clients suitable for transmission over said electronic network, said second electronic communication comprising a personalized notice concerning said at least one *financial product or service*; wherein said personalized notice includes at least both said *variable information* and said client identification information;
 g) sending said first electronic communication by email through said electronic network to at least one of said certain clients.

The '938 Patent and the '184 Patent generally share a common specification with the other Asserted Patents, but also include a system for automatically preparing customized replies in response to communications from a client. As an example, the Abstract of the '938 Patent states the following:

> A system for automatically preparing customized replies in response to communications from a plurality of clients. To facilitate automation and tracking, each original communication to the client (or each original response from the client) is tagged with a unique label, and replies to client responses are each correspondingly labeled. The system provides individualized replies to each of a variety of response options that a client might exercise in response to a received communication, whether an original communication or a reply to a previous response. The system is applicable to mass marketing communications, and is particularly well suited to the generation of personalized replies to each and every one of a multitude (tens of thousands and up to millions) of communications from clients. The system is also capable of continuing to generate replies to follow-up responses from clients and to thereby maintain an ongoing "conversation" until the client makes a purchase decision, or no longer responds. Communications may be delivered through a variety of means, such as the internet, the mails, by facsimile, on a host communication, etc.

'938 Patent at Abstract. Claim 52 is a representative claim of the '938 Patent and recites the following elements (disputed terms in italics):

> 52. A method for *automatically* preparing customized communications for a plurality of consumer entities, and replying to *responses* from consumer entities with customized replies, the method comprising:
>> *automatically* preparing a mass marketing customized communication for *each* consumer entity, said communication comprising information relating to an *offering* for one or more *financial products or services* being offered as part of a mass marketing campaign;
>> delivering *each* communication to a respective one of the plurality of consumer entities; receiving one or more *responses* from at least some consumer entities, said *responses* comprising nonpurchase requests and being in *response* to communications;
>> *automatically* generating one or more replies for at least some of the *responses* or subsequent *responses*, *each* of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more *financial products or services*

being offered as part of said mass marketing campaign, *each* reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

delivering said replies to associated consumer entities.

## II.    APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v.*

*Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the

U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in

*Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[1] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or

---

[1] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

restriction, representing a clear disavowal of claim scope.") "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent"). Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

### C. Means-Plus-Function Limitations

The asserted patents also contain means-plus-function limitations that require construction. Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must

turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

### D. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) [2]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 2124. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Id.* at

---

[2] Because the Asserted Patents have an effective filing date before September 16, 2012, the effective date of the America Invents Act ("AIA"), the Court refers to the pre-AIA version of § 112.

2130 n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005); *accord Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (citing *Datamize*, 417 F.3d at 1351).

### III. CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
| --- | --- |
| "[client / customer] information" | "information which pertains to a particular [client / customer], or to a particular set or group of [clients / customers]" |
| "client communication" | "a communication which is prepared for a given client and which provides information to the client about one or more selected financial products and/or financial services and/or related financial plans" |
| "client record" | "a compilation of information pertaining to a particular client" |
| "customized" | "specifically tailored for a particular person, but not necessarily unique to the person" |
| "decision [criteria / information]" | "instructions that enable the CPU to select from among the [financial products / plan features / product-related information] " |
| "financial product[s] information" | "information which identifies, describes, explains or otherwise pertains to the financial product or products (including services and plans) which are to be the subject of some or all of the client communications" |

| | |
|---|---|
| "means for … storing" | function: storing<br><br>structure: computer-accessible storage medium, database, RAM, mass storage device, and equivalents thereof |
| "means for appending each communication to a host communication to form a plurality of combined communications" | function: appending each communication to a host communication to form a plurality of combined communications<br><br>structure: network server processor specifically programmed to implement processor module disclosed in Figs. 4, or 10:9-35 , and equivalents thereof |
| "means for automatically generating and communicating one or more follow up replies to at least some of said follow up responses" | function: automatically generating and communicating one or more follow up replies to at least some of said follow up responses<br><br>structure: network server processor specifically programmed to implement sales presentation and output module disclosed in Figs. 7-13, or 18-21, or 24:21-28:11 or 30:55-34:40, and equivalents thereof |
| "means for receiving [one or more] [follow up] responses [based on the replies from a plurality of consumer entities]" | function: receiving [one or more] [follow up] responses [based on the replies from a plurality of consumer entities]<br><br>structure: network server processor specifically programmed to Fig. 20 or 33:35-34:6, and equivalents thereof |
| "nonpurchase request" | "a request that does not include an order to buy or purchase the offered financial product(s) or service(s), such as a request for further information, a request for a modified product, a request for a different type of quotation, or the like" |
| "offer[ing]" | plain meaning |
| "personalized" | "specifically tailored for a particular person, but not necessarily unique to the person" |
| "personalized communication document" | "document specifically tailored for a particular person, but not necessarily unique to that person" |
| "repl[y/ies]" | "responsive communication(s) that respond(s) to a response from a client" |

|  |  |
|---|---|
|  |  |

Dkt. No. 106 at 2-3 (Joint Claim Construction and Prehearing Statement). In view of the parties' agreements on the proper construction of each of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

### IV.     CONSTRUCTION OF DISPUTED TERMS

The parties' dispute the meaning and scope of twenty-five terms/phrases in the Asserted Patents. As an initial matter, the Court finds that Defendants did not properly present arguments for a number of other terms/phrases. Defendants stated in their brief that they "hereby incorporate by reference the arguments made in the 1081 Case, which are identified in Exhibit A."[3] (Dkt. No. 116 at 4). The Court finds that incorporating arguments by reference is improper and would circumvent the page limit requirements established by the Court's Local Rules. *See* Local Rule CV-7(a).

To justify their non-compliance, Defendants stated that "[r]ather than reproduce the 1081 Case briefing on those issues, Defendants believe it to be more prudent and in the interest of efficiency to instead refer the Court to the prior-made arguments in a more abbreviated fashion." (Dkt. No. 116 at 3). Circumventing the Court's Local Rules is neither prudent nor efficient. To be clear, a party cannot preserve "positions for appeal" without properly presenting those positions to the Court for consideration. (*Id.* at 4). Accordingly, the Court finds that Defendants did not properly present arguments for the terms/phrases summarily listed in Exhibit A submitted with their responsive claim construction brief. (Dkt. No. 116-1). Thus, as indicated below, the Court only considered arguments that were properly presented in the briefing and at the claim construction hearing in this case.

---

[3] The "1081 Case" refers to *Phoenix Licensing, L.L.C., et al. v. AAA Life Insurance Company*, 2:13-cv-1081-JRG-RSP (the "1081 case").

### 1. "distinct choices"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "distinct choices" | plain and ordinary meaning | Consistent with the Court's previous orders, but clarify that a text field/text entry box cannot be a distinct choice |

### a) The Parties' Positions

The parties dispute whether "distinct choices" may include text fields or text entry boxes. Plaintiffs argue that the term "distinct choices" is used in the claims according to its plain meaning. (Dkt. No. 114 at 17). Plaintiffs also argue that there is nothing in the intrinsic record that redefines the term. (*Id.* at 18) (citing '114 Patent at 22:26–33, Figure 12). Plaintiffs further contend that the specification of the '434 Patent discloses "giv[ing] you the choice of selecting the particular type of coverage that best suits your individual needs." (Dkt. No. 114 at 18) (citing '434 Patent at Appendix 1A). Regarding Defendants' construction, Plaintiffs argue that there is nothing in the intrinsic record that excludes text fields or text entry boxes. (Dkt. No. 114 at 18). Plaintiffs further argue that a person of ordinary skill in the art could reasonably understand a text field to constitute a distinct choice. (*Id.*).

Defendants respond that a blank text field or text entry box cannot "contain distinct choices particular to the offering." (Dkt. No. 116 at 5). Defendants argue that a "distinct choice" cannot be "selected by the certain clients" if there are not two or more options from which to choose. (*Id.*). Defendants contend that Figure 12 and the specification of the '184 Patent discuss "choices," but do not discuss "text fields" or "text entry boxes." (*Id.*). Defendants argue that the "choice" described in the specification are, by definition, "distinct" or "noticeably different" from one another. (*Id.*). According to Defendants, a "choice" is "the act of picking or deciding between two or more possibilities." (*Id.*). Defendants argue that a blank text field or text entry box does not present two or more possibilities from which to choose. (*Id.*).

Plaintiffs reply that nothing in the intrinsic record indicates a clear and unambiguous disavowal of a "text field/text entry box." (Dkt. No. 118 at 9). According to Plaintiffs, the intrinsic record expressly identifies text fields/text entry boxes as examples of choices that may be made by a recipient of communication generated as disclosed in the specification. (*Id.* at 10) (citing Appendix 1C of the '434 Patent).

For the following reasons, the Court finds that the term **"distinct choices"** should be given its plain and ordinary meaning.

### b) Analysis

The term "distinct choices" appears in asserted claim 1 of the '184 Patent. Defendants contend that they seek to "clarify" that a text field and/or a text entry box cannot be a "distinct choice." The Court's disagrees with Defendants' negative limitation and finds that the term should be given its plain and ordinary meaning. The Court agrees that the plain language of plural "choices," as well as the adjective "distinct," requires more than just one choice. Accordingly, the Court finds that presenting a single binary "choice" is not "distinct choices." For example, presenting "yes" by itself, or together with "no," would not be "distinct choices." Likewise presenting "buy" by itself, or together with "decline," would not be "distinct choices." In both instances, the client is not presented with "distinct choices," but instead is presented with a single choice.

However, presenting "buy" along with some other choice would be "distinct choices." For example, Figure 21 in the '184 Patent illustrates "distinct choices" by including in block 2570 the "buy" and "more information," or "buy" and "other request." In this example, the client is presented with "distinct choices" because the client can either select "buy" or select "more information." Similarly, Appendix 1C of the '434 Patent identifies text fields/text entry boxes as

examples of choices that may be made by a recipient of a communication. '434 Patent at Appendix 1C (illustrating the text entry field under "Amount" in the "NEED ADDITIONAL INSURANCE?" section.). Therefore, the Court rejects Plaintiffs' argument to the extent that they contend that "choices" includes a single choice. Likewise, the Court rejects Defendants' argument to the extent that they contend that a text field and/or a text entry box cannot be a "distinct choice." Other than these points of clarification, the Court finds that the term should be given its plain and ordinary meaning.

### c) Court's Construction

The term **"distinct choices"** will be given its plain and ordinary meaning.

### 2. "client," "consumer entity," "person"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "client" | plain and ordinary meaning | "actual or potential client or customer of the user of the invention or the party for whom the invention is employed, for whom client information has already been compiled and stored in a database" |
| "consumer entity" | plain and ordinary meaning | "actual or potential client or customer of the user of the invention or the party for whom the invention is employed, for whom client information has already been compiled and stored in a database" |
| "person" | plain and ordinary meaning | "actual or potential client or customer of the user of the invention or the party for whom the invention is employed, for whom client information has already been compiled and stored in a database" |

### a) The Parties' Positions

The parties agree that these terms refer to an actual or potential client. (Dkt. No. 114 at 9) (citing '938 Patent at 5:60–65). The parties dispute whether the client or customer "of the user of

the invention or the party for whom the invention is employed," as Defendants propose. The parties also dispute whether the information about the client must have "already been compiled and stored in a database," as Defendants propose.

Plaintiffs argue that specifying whose client or customer is an exercise in redundancy. (Dkt. No. 114 at 9). Plaintiffs also argue that requiring the information about the client to be "already compiled and stored in a database" improperly narrows the terms to the Defendants' reinterpretation of a single embodiment. (*Id.* at 9-10). Plaintiffs contend that the intrinsic record refers to "a client record [that] has been created in the client database," and is expressly described as "for illustrative purposes." (*Id.* at 10) (citing '938 Patent at 5:66–6:2). Plaintiffs further contend that other references in the intrinsic record also refer to a "client record [that] has been created in [a] database" only in the context of an "existing client," and not a "prospective client." (Dkt. No. 114 at 10) (citing '317 Patent at 1:47–54).

Defendants respond that these terms are not redundant, because the patentee was his own lexicographer and specifically defined the term "client" in the '938 and '744 Patents. (Dkt. No. 116 at 6) (citing '938 Patent at 5:63–6:2; '744 Patent at 5:42–47). Defendants contend that Plaintiffs' construction would include complete strangers who might be future clients even if no information about them is known. (Dkt. No. 116 at 6). According to Defendants, client was not intended to cover individuals who are strangers to the user, but might be considered a "potential" client in the broadest sense. (*Id.*). Defendants further argue that Plaintiffs do not explain how the present invention could automatically "prepare personalized and individualized communications" without information about the client or customer already being stored on a database. (*Id.*).

Defendants also argue that the '317 Patent specification explains that client information

must be first collected in order to "initiate the marketing contact." (*Id.* at 7) (citing '434 Patent at 1:19–43; '317 Patent at 1:47–54). Defendants further contend that the purpose of the invention is to automatically prepare personalized client communications. (Dkt. No. 116 at 7) (citing '744 Patent at 3:10–36). Defendants argue that without first obtaining the "limited amount of basic … information about the prospective client," it would not be possible to meet the stated purpose of the invention. (Dkt. No. 116 at 7) (citing *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015)).

Plaintiffs reply that nothing in the record suggests that these terms require that "client information has already been compiled and stored in a database," even where the client is a potential client. (Dkt. No. 118 at 7). Plaintiffs argue that the portion of the specification Defendants cite is expressly described as "for illustrative purposes" only. (*Id.*) (citing '938 Patent at 5:63–6:2). Plaintiffs contend that when the patentee intended for client information to have "already been compiled and stored in a database," he claimed so expressly. (Dkt. No. 118 at 7) (citing '434 Patent at Claim 2). Plaintiffs further argue that when he did not intend the claims to require storing information about a client, he made no mention of it. (Dkt. No. 118 at 7) (citing '938 Patent at Claims 1, 52, 141, 184, 226, 268). Finally, Plaintiffs contend that express limitations that refer to client information already being stored would be superfluous if the term "client" alone already included that requirement. (Dkt. No. 118 at 8) (citing '434 Patent at Claim 2).

For the following reasons, the Court finds that the term **"client"** should be construed to mean **"an actual client or customer or a potential client or customer for whom a communication is prepared."** The Court also finds that the terms **"consumer entity"** and **"person"** should be given their plain and ordinary meaning.

**b) Analysis**

The term "client" appears in asserted claims 2, 22, 48, 52, 66, 69, 109, 119, and 122 of the '434 Patent; asserted claims 1, 2, 3, 8, 9, 10, 17, 28, 29, and 31 of the '744 Patent; and asserted claims 1, 7, 9, 11, 14, and 27 of the '184 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "consumer entity" appears in asserted claims 1, 52, 59, 62, 184, 185, 201, 202, 226, 242, 266, 308, 309, 310, and 311 of the '938 Patent; asserted claims 1, 11, 17, 18, 28, 42, 60, 70, 74, 79, 90, 96, 105, 106, 113, and 114 of the '366 Patent; and asserted claims 80, 85, 87, 94, 99, 107, 111, 122, and 123 of the '375 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "person" appears in asserted claims 1, 25, and 52 of the '317 Patent; asserted claims 1, 9, 10, 15, 16, 24, 26, and 30 of the '435 Patent; and asserted claim 1 of the '632 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.

Regarding the term "client," the Court finds that the specification explicitly defines the term as follows:

> "Client" as the term is used here should be interpreted broadly to include an actual client or customer of the user of the system and/or method according to the invention, or the party for whom the system and/or method is employed. The term "client" also includes a potential client or customer, or a similar party for whom a communication is prepared. A client is assumed for illustrative purposes here to be a party for whom a client record has been created in the client database as described more fully below.

'938 Patent at 5:63–6:2. Defendants argue that the construction should further specify that client is the "client or customer of the user of the invention or the party for whom the invention is employed." Plaintiffs contend that specifying whose client or customer is an exercise in redundancy. The Court agrees. Defendants' addition is redundant and does not provide further clarity to the term "client."

Plaintiffs also argue that requiring the information about the client to be "already compiled and stored in a database" improperly narrows the terms to a single embodiment. The Court agrees that "already compiled" is potentially too narrow. The portion of the specification Defendants cite is described as "for illustrative purposes" only. Specifically, the specification state that "[a] client is assumed *for illustrative purposes* here to be a party for whom a client record has been created in the client database . . . ." '938 Patent at 5:66–6:2 (emphasis added).

Moreover, the intrinsic record indicates that when the patentee intended for client information to have "already been compiled and stored in a database," it was expressly recited in the claims. For example, claim 2 of the '434 Patent recites "automatically inputting into a computer-accessible storage medium the client information . . . ." In contrast, claim 1 of the '938 Patent does not reference client information, or compiling and storing client information. Moreover, requiring the client information to already be stored would be superfluous in claim 2 of the '434 Patent, which recites inputting the client information. Accordingly, the Court rejects Defendants' construction.

Regarding the terms "consumer entity" and "person," the Court finds that the terms should be given their plain and ordinary meaning. Unlike the term "client," the specification does not provide an explicit definition for these terms. Moreover, certain claims do not recite "client information," or the compiling and storing of "client information." For example, claim 1 of the '938 Patent only refers to "receiving one or more responses from one or more consumer entities . . . being in response to mass marketing communications . . . ." In other words, claim 1 does not need to first obtain client information to meet the stated purpose of the invention.

During the claim construction hearing, Defendants argued that the recited "consumer entity" and "person" is not just anybody in the world. The Court appreciates that the terms are broad, but is not persuaded that they should be given something other than their plain and ordinary meaning. Defendants do not contend that these are coined terms. In addition, the claims provide the context for these terms and indicate that the recited "consumer entity" or "person" is not just anybody in the world. Accordingly, the Court finds that the terms should be given their plain and ordinary meaning.

### c) Court's Construction

The Court construes the term **"client"** to mean **"an actual client or customer or a potential client or customer for whom a communication is prepared."** The terms **"consumer entity"** and **"person"** will be given their plain and ordinary meaning.

### 3. "client identifications"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "client identifications" | plain and ordinary meaning | "minimum information to uniquely identify an individual client and the client's contact information (not merely a zip code or other information that requires analysis to identify the client)" |

### a) The Parties' Positions

The parties dispute whether the patentee explicitly excluded from the scope of "client identification" both a zip code by itself, and any other information requiring additional analysis to identify a client. Plaintiffs argue that Defendants' construction impermissibly limits the term to exemplary embodiments. (Dkt. No. 114 at 8) (citing '938 Patent at 11:55–12:7). According to Plaintiffs, the term is not limited to the "minimum information," proposed by Defendants. (Dkt. No. 114 at 9).

Defendants respond that "client identification" is a specially defined term in the patents.

(Dkt. No. 116 at 8). According to Defendants, the specification limits client identification to exclude information which does not uniquely identify the client. (*Id.*) (citing '744 Patent at 10:44–48; '938 Patent at 11:61–65). Defendants agree that the client identification is not limited to the minimum information, but argue that it must include at least that minimum information. (Dkt. No. 116 at 8). Defendants contend that the specification also identifies examples of specific information that do not constitute the minimum information necessary for client identification. (*Id.*) (citing '744 Patent at 10:48–56; '938 Patent at 11:65–12:7). According to Defendants, the patentee specifically excluded these examples from the plain and ordinary understanding of anything that could be used to identify a client. (Dkt. No. 116 at 8).

Defendants further contend that Plaintiffs excluded from the scope of "client identification" both a zip code by itself and any other information requiring additional analysis to identify a client. (*Id.* at 9). Defendants also argue that the patentee distinguished client identification (*e.g.*, name and address) from other types of client information (*e.g.*, age, occupation, marital status, income, zip code). (*Id.*) (citing '744 Patent at 2:8–15; '938 Patent at 11:20–21). According to Defendants, the latter category would require additional analysis to ascertain a unique identification of a particular client. (Dkt. No. 116 at 9).

Plaintiffs reply that Defendants' construction should be rejected because it ignores the specification's reference to "the minimum information … necessary to uniquely identify the client and forward the communication to the client" as an "example" of "client identification." (Dkt. No. 118 at 9) (citing '938 Patent at 11:55–12:7). Plaintiffs also argue that claim 20 of the '744 Patent provides that the "client identification can include one or more of a name, a physical address and/or an account number." (Dkt. No. 118 at 9). Plaintiffs contend that Defendants' construction is inconsistent with claim 20 because a "name" does not necessarily "uniquely

identify an individual client" and is not "contact information." (*Id.*).

For the following reasons, the Court finds that the term **"client identifications"** should be construed to mean **"information about the client which uniquely identifies a given client and permits correspondence or communications to be forwarded to the client."**

### b) Analysis

The term "client identifications" appears in asserted claim 59 of the '938 Patent. The Court finds that the specification includes an explicit disavowal of "information which may happen to be unique to the client and may uniquely identify the client under analysis, but which information is not typically used to identify the client; and a client's postal zip code used separately from the postal address." The specification provides the following definition for "client identification:"

> **"Client identification"** as used herein includes the ***information about the client which uniquely identifies a given client and permits correspondence or communications to be forwarded to the client.*** In most instances this client identification constitutes the client's name, or the client's name and post office address. A client account number also may be included. This term is intended to be construed narrowly, for example, to include only the minimum information, usually name and postal address, necessary to uniquely identify the client and forward the communication to the client. ***It would not include***, for example, ***information which may happen to be unique to the client and may uniquely identify the client under analysis, but which information is not typically used to identify the client***. Individual components of client identification other than client name also typically would not be included within the scope of the term client identification as used herein. ***A client's postal zip code used separately from the postal address***, for example, ***would not qualify as the client identification***.

'938 Patent 11:55–12:7 (emphasis added). Here, the patentee made a disavowal by explicitly excluding from the scope of "client identification" both a zip code by itself and any other information requiring additional analysis to identify a client. *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[D]isavowal requires that the specification or prosecution history make clear that the invention does not include a

particular feature."). This is consistent with other parts of the specification that further illustrate the difference between "client identification" information and other types of client information:

> This client information typically includes not only such fundamental "client identification" information as client name and address, but often additional items such as client age, occupation, marital status, income, and the like. In many instances, the client information includes or is sufficient to derive certain information about needs and purchasing habits of the client.

'744 Patent at 2:8–15; *see also* '938 Patent at 11:20–21 ("Examples would include client information (generally other than a client identification)…"). As indicated, the patentee distinguished client identification (*e.g.*, name and address) from other types of client information (*e.g.*, age, occupation, marital status, income, zip code alone). The latter category would require additional analysis to ascertain a unique identification of a particular client.

Plaintiffs argue that the limitations Defendants seek to include are clearly described merely as "example[s]." (Dkt. No. 114 at 9). Plaintiffs are correct that these are examples, but Plaintiffs ignore that these are examples of what the term "client identification . . . would not include." Plaintiffs also argue that Defendants overlook claim 20 of the '744 Patent, which provides that the "client identification can include one or more of a name, a physical address and/or an account number." The Court finds that there is nothing inconsistent with the claim 20 and the Court's construction. If a name, physical address, and/or account number can uniquely identify a client and permit correspondence or communications to be forwarded to the client, then it would not be excluded from the scope of the Court's construction.

### c) Court's Construction

The Court construes the term **"client identifications"** to mean **"information about the client which uniquely identifies a given client and permits correspondence or communications to be forwarded to the client."**

### 4. "[alternative / distinct / separate] descriptions, characteristics and/or identifications [associated with / for] [the offer[ing] / at least a first financial product and/or financial service]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "[alternative / distinct / separate] descriptions, characteristics and/or identifications [associated with / for] [the offer[ing] / at least a first financial product and/or financial service]" | plain and ordinary meaning | "different product-related information sufficient to enable the client to make an informed, intelligent decision regarding the purchase of the plans or products offered to the client, other than pricing information about the plans or products offered" |

### a) The Parties' Positions

The parties dispute whether "pricing information" is included in the recited "descriptions, characteristics and/or identifications."[4] Plaintiffs argue that the intrinsic record provides examples that confirm a broad and ordinary understanding of how financial products and services are described, characterized, or identified in communications generated by the claimed inventions. (Dkt. No. 114 at 11) (citing '366 Patent at 9:61–10:8, 11:7–23). Plaintiffs contend that there is no basis to exclude pricing information, especially where pricing information is included in the intrinsic record's description of "financial product information." (Dkt. No. 114 at 12).

---

[4] Defendants' original construction included "information sufficient to enable the client to make an informed, intelligent decision regarding the purchase of the plans or products offered." (Dkt. No. 116 at 17). During the claim construction hearing, Defendants agreed to remove this language from their construction.

Defendants respond that they seek to clarify that the claimed "descriptions, characteristics and/or identifications" cannot include pricing information. (Dkt. No. 116 at 17). Defendants contend that the patent specification distinguishes "pricing information" from "non-pricing information" (*Id.*) (citing '938 Patent at 12:27–33). Defendants argue that the specification goes on to explain that "pricing information" "includes the pricing for the relevant products" and "other information relevant to pricing," while "non-pricing information includes any financial product information other than product pricing information" including "product-related descriptions." (Dkt. No. 116 at 18) (citing '938 Patent at 12:33–41). Defendants also contend that the specification distinguishes "the identification of the products" from "information about pricing," and thus the claimed "identifications" cannot include pricing information. (Dkt. No. 116 at 18) (citing '938 Patent at 17:30–41). Defendants further argue that the claims similarly recite "pricing" separate from "descriptions, characteristics and/or identifications." (Dkt. No. 116 at 18) (citing '184 Patent at Claim 4; '366 Patent at Claims 1 and 12).

Plaintiffs reply that the phrase "descriptions, characteristics and/or identifications" is broad, and the specification provides that information about financial products and services "includes product pricing information and non-pricing information." (Dkt. No. 118 at 5) (citing '938 Patent at 12:27–33). Plaintiffs further argue that a price can describe a product, especially where pricing information includes "pricing for the relevant products, … [and] other information relevant to pricing, for example, such as the time period during which particular prices will be available, payment terms, available financing terms, etc." (Dkt. No. 118 at 6) (citing '938 Patent at 12:33–38). Plaintiffs further argue that Defendants' claim differentiation arguments are flawed. (Dkt. No. 118 at 6).

For the following reasons, the Court finds that the phrase **"[alternative / distinct /**

separate] **descriptions, characteristics and/or identifications [associated with / for] [the offer[ing] / at least a first financial product and/or financial service]**" should be given its plain and ordinary meaning.

### b) Analysis

The phrase "[alternative / distinct / separate] descriptions, characteristics and/or identifications [associated with / for] [the offer[ing] / at least a first financial product and/or financial service]" appears in asserted claim 4 of the '184 Patent; asserted claims 1, 28, 60, 90, and 114 of the '366 Patent; asserted claims 1, 15, and 29 of the '435 Patent; and asserted claims 80, 87, 122, and 123 of the '375 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.

The Court further finds that Defendants' negative limitation is unwarranted. The Court agrees that the specification states that "non-pricing information includes any financial product information other than product pricing information" including "product-related descriptions." '938 Patent at 12:33–41. The Court also agrees that the specification discusses "the identification of the products" separate from "information about pricing." '938 Patent at 17:30–41. However, the specification does not preclude "pricing information" from being a characteristic. During the claim construction hearing, Defendants conceded that the specification does not discuss "characteristics." Indeed, Defendants cannot point to a clear and unambiguous disavowal of claim scope that would exclude pricing information as a characteristic. Accordingly, the Court rejects Defendants' negative limitation.

Regarding Defendants' claim construction arguments, the Court finds that dependent claim 12 of the '366 Patent recites that "said personalized content further includes pricing information that is varied between consumer entities." Claim 12, however, does not refer to the

"alternative descriptions, characteristics and/or identifications" of the financial product or service in independent claim 1. Instead, claim 12 refers to the "personalized content" in the "personalized section" of the communication generated by independent claim 1. '366 Patent at Claims 1 & 12. Claim 12 also indicates that the pricing information "varie[s]" between consumers, not that pricing information is something different that a "description, characteristic, or identification." Regarding claim 4 of the '184 Patent, the Court finds that it is directed to the "variable data" of independent claim 1. Importantly, independent claim 1 of the '184 Patent does not include the claim terms in dispute here. Accordingly, the Court rejects Defendants' construction.

### c) Court's Construction

The phrase **"[alternative / distinct / separate] descriptions, characteristics and/or identifications [associated with / for] [the offer[ing] / at least a first financial product and/or financial service]"** will be given its plain and ordinary meaning.

### 5. "[personalized notice / information] [concerning / relating to an offering for] said [first / at least one] financial product or service"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "[personalized notice / information] [concerning / relating to an offering for] said [first / at least one] financial product or service" | plain and ordinary meaning | "a notice relating to an offer of a financial product or service" |

### a) The Parties' Positions

The parties dispute whether a "notice" must be related to an "offer," as Defendants propose. Plaintiffs argue that claim 1 of the '744 Patent refers simply to a "personalized notice

concerning said first financial product or service." (Dkt. No. 114 at 14). Plaintiffs further argue that the specification confirms that "notice" is used in its ordinary sense. (*Id.*) (citing '744, 22:49–53). According to Plaintiffs, nothing in the intrinsic record suggests that every "notice" must "relate to an offer of a financial product or service." (Dkt No. 114 at 14). Plaintiffs contend that dependent claim 19 of the '744 Patent demonstrates that the notice need not be limited to an offer of a product or service since the notice may include "client account balance information." (*Id.* at 15). Plaintiffs further contend that claims 28 and 29 of the '744 Patent expressly recite that the "electronic communication compris[e] information relating to an offering for said at least one financial product or service." (*Id.*).

Defendants respond that the '744 Patent repeatedly states that the notice must relate to an offer of a financial product or service. (Dkt. No. 116 at 10) (citing '744 Patent at Abstract). Defendants also argue that the patentee made "present invention" statements, which limit the scope of the patent to automatically preparing financial product or service related communications. (Dkt. No. 116 at 10) (citing '744 Patent at 1:22–31). Defendants further argue that the patentee stated the purpose of the invention is to automatically prepare personalized client communications so the client or potential client can make an informed buying decision regarding an automatically selected or recommended product. (Dkt. No. 116 at 10) ('744 Patent at 3:10–36). Defendants also contend that this is consistent with the examiner's reading of the patent and claims. (Dkt. No. 116 at 11) (citing Dkt. No. 116-2 at 11).

Defendants also argue that claim 19 of the '744 Patent merely references the "host vehicle" (*e.g.*, an account balance statement) that a personalized product offer is then coupled with to create a single document. (Dkt. No. 116 at 11). Defendants contend that the patent applies to communications to both existing and potential clients. (*Id.*) (citing '744 Patent at

5:42–47). Defendants further argue that Plaintiffs' reading of claims 28 and 29 of the '744 Patent would encompass sending a customer's billing statement via email instead of regular mail. (Dkt. No. 116 at 12). Defendants argue that this would be wholly outside the scope of patentee's description of the "present invention." (*Id.*).

Plaintiffs reply that the Abstract states that the "personalized notice pertain[s] to financial products or services …." (Dkt No. 118 at 11). Plaintiffs argue that "pertaining" to a financial product or service does not necessarily mean an "offer of a financial product or service." (*Id.*). Plaintiffs further argue that Defendants' quote of a "present invention" does not support their argument. (*Id.* at 11-12). Plaintiffs also contend that when the patentee intended for the "personalized notice" to include an "offer," he recited it in the claims. (*Id.* at 12) ('744 Patent at claims 1, 20, 28, and 36).

For the following reasons, the Court finds that the phrase **"[personalized notice / information] [concerning / relating to an offering for] said [first / at least one] financial product or service"** should be given its plain and ordinary meaning.

### b) Analysis

The phrase "[personalized notice / information] [concerning / relating to an offering for] said [first / at least one] financial product or service" appears in asserted claims 1 and 29 of the '744 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the recited "notice" is not required to be related to an "offer." Contrary to Defendants' contention, nothing in the specification requires the notice to be an offer. Indeed, the portions of the specification cited by Defendants do not include the word "offer" or "offering." Instead, the specification indicates that "notices" is one example of a client communications.

Specifically, it is listed with other examples that include "[m]arketing solicitations, ads, product- or service-related notices, presentation letters, followup letters, and reminders . . . ." '744 Patent at 22:49-53.

Moreover, the "present invention" statement expressly distinguishes between "notices," the term at issue here, and "advertisements, marketing solicitations, financial product sales solicitations." In sum, a person of ordinary skill would understand that any of these examples could provide "information sufficient to enable the client to make informed, intelligent decision regarding the purchase of the plans or products selected by the processor module, *or sufficient to gain the interest of a prospective buyer and motivate him or her to seek additional information*." '744 Patent at 22:54-59 (emphasis added).

Defendants also argue that their construction is consistent with the examiner's reading of the patent and claims. (Dkt. No. 116 at 11). The Court disagrees that the prosecution history clearly supports Defendants' construction. The limitation in question was "variable information based on client purchasing information," and not the recited "notices." (Dkt. No. 116-2 at 11). Moreover, Plaintiffs correctly point out that when the patentee intended for the "personalized notice" to include an "offer," he recited it in the claim. For example, claims 28 and 36 of the '744 Patent expressly refer to "information relating to an offering for said at least one financial product or service."

### c) Court's Construction

The phrase **"[personalized notice / information] [concerning / relating to an offering for] said [first / at least one] financial product or service"** will be given its plain and ordinary meaning.

**6. "automatically generat[e/ing] … communication data outputs for a plurality of clients … wherein the communication data outputs comprise at least two components"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "automatically generat[e/ing] … communication data outputs for a plurality of clients … wherein the communication data outputs comprise at least two components" | See "automatic[ally]," No further construction necessary. | "create, by a single, computerized process, and without input from a human, at least two components of a communication data output (e.g. the two components of each communication data output are generated close-in-time and/or by the same process)" |

### a) The Parties' Positions

The parties dispute whether the disputed phrase should be construed to include a "single, computerized process," "close-in-time," or "same process," as Defendants propose. Plaintiffs argue that Defendants' limitations are unsupported by the record. (Dkt. No. 114 at 17). Plaintiffs contend that nothing in the claim language requires that the automatic generation of the communication data outputs be created by a single, computerized process or that the two components of the output be generated close-in-time or by the same process. (*Id.*) Plaintiffs also argue that the specification makes no reference to a "single, computerized process," "close-in-time," or the "same process." (*Id.*) Plaintiffs further contend that the dependent claims of the '184 Patent confirm that Defendants' proposal is too narrow. (*Id.*) (citing '184 Patent at Claims 2, 9, 12, 31, and 38).

Defendants respond that the specification plainly contemplates that for a given set or subset of clients, the generation of individualized client communications occurs in a single step. (Dkt. No. 116 at 13) (citing '184 Patent at 23:30–35; 33:34–39). According to Defendants, the specification does not contemplate a system in which email communications are generated at one time, and then days, weeks, or months later, similar communications are created and displayed

on a website. (Dkt. No. 116 at 13). Defendants further argue that Plaintiffs' arguments ignore statements made by the patentee during prosecution. (*Id.* at 13-14) (Dkt. No. 116-3 at 16).

Finally, Defendants contend that Plaintiffs' claim differentiation arguments fail. (Dkt. No. 116 at 14). Defendants argue that claims 2, 31, and 38 of the '184 Patent say nothing of the computerized process that uses information obtained from the recited databases. (*Id.*). Defendants also argue the asynchronous generation recited in claim 9 is consistent with Defendants' construction. (*Id.*) Defendants also argue that Plaintiffs' reliance on claim 12 is misplaced, because the claim does not relate to the communication data outputs generated in the first step of claim 1. (*Id.*)

Plaintiffs reply that there is no reference anywhere in the record to "single, computerized process," "close-in-time," or "same process." (Dkt. No. 118 at 7). Plaintiffs contend that there is no basis to support Defendants' conclusion that concepts never mentioned in the intrinsic record are somehow contemplated. (*Id.* at 7). Plaintiffs argue that the language of the claims expressly refers to databases used to generate the communication data outputs at "multiple facilities," and the two components of the communications being "generated asynchronously." (*Id.*) (citing '184 Patent at Claims 2, 9, 12, 31 & 38). Plaintiffs contend that "asynchronous" encompasses both close- and far-away-in-time. (Dkt. No. 118 at 7).

For the following reasons, the Court finds that the phrase **"automatically generat[e/ing] … communication data outputs for a plurality of clients … wherein the communication data outputs comprise at least two components"** does not require construction.

### b) Analysis

The phrase "automatically generat[e/ing] … communication data outputs for a plurality of clients … wherein the communication data outputs comprise at least two components"

appears in asserted claim 1 of the '184 Patent. The Court finds that there is no reference in the intrinsic record to "single, computerized process," "close-in-time," or "same process." Defendants argue that a single, close-in-time process is "plainly contemplated" by the patentee and specification. Contrary to Defendants' contention, there is no basis for limiting the claims to concepts not mentioned in the intrinsic record.

Moreover, the claims indicate that Defendants' construction in unwarranted, because the claims refer to multiple systems that may operate at different times. Specifically, the claims expressly refers to databases used to generate the communication data outputs at "multiple facilities," and two components of the communications being "generated asynchronously." '184 Patent at claims 2 and 9.

Defendants argue that their construction is consistent with "asynchronous" because "close-in-time" does not mean "at the exact same moment." The Court agrees that "asynchronous" would not be interpreted to mean "at the exact same moment." However, the term "asynchronous" is not limited to only "close-in-time," as Defendants propose. Finally, Defendants cite an Inventor Declaration submitted with the January 30, 2012 Response to Office Action and a Rule 131 declaration. (Dkt. No. 116 at 13-14). Consistent with the other intrinsic evidence, nothing in this evidence refers to "single, computerized process," "close-in-time," or "same process." Given that the term "automatic[ally]" will be construed to mean "performed by a computer without input from a human," the Court finds that no further construction is necessary.

### c) Court's Construction

The phrase **"automatically generat[e/ing] … communication data outputs for a plurality of clients … wherein the communication data outputs comprise at least two**

**components"** does not require construction.

### 7. "executing a first software routine via the at least one processor coupled to said first database and configured to automatically and without human intervention prepare a first electronic communication"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "executing a first software routine via the at least one processor coupled to said first database and configured to automatically and without human intervention prepare a first electronic communication" | plain and ordinary meaning | "first software routine is executed by a processor connected to the first database in which the software routine utilizes the processor and the first database to automatically, and without human intervention, prepare a first electronic communication" |

#### a) The Parties' Positions

The parties dispute whether the phrase needs to be clarified (1) to make clear that the phrase "coupled to" means that the recited processor is connected to the first database, and (2) to emphasize that the software routine executed on the processor serves to automatically, and without human intervention, prepare a first electronic communication, as Defendants propose. Plaintiffs argue that neither the claim language nor the specification provide a special definition for the phrase. (Dkt. No. 114 at 13). Plaintiffs contend that there is no support for the swap, and doing so changes the object of the limitation from the processor to the "software routine" as utilizing the processor and the first database to prepare the first electronic communication. (*Id.*).

Defendants respond that the first point of clarification is consistent with the meaning of the term "coupled to" as used in the claims and throughout the specification of the '744 Patent. (Dkt. No. 116 at 15) (citing '744 Patent at 4:3–12, 16:25–30, Figure 1, Claims 1, 25, 28, and 29). Defendants further argue that the second point of clarification is also consistent with the plain language of the claim 1, the preamble of which recites "the method using at least one processor."

(Dkt. No. 116 at 15) Finally, Defendants argue that their construction is also consistent with the specification of the '434 Patent and the '744 Patent. (*Id.*). Defendants contend that the specifications make clear that the software routines for formatting communications are executed by the claimed system's processor connected to the claimed database. (*Id.*) (citing '744 Patent at Figures 6–9; '434 Patent at Abstract, 4:1–4: 20:19–27, Figures 6–9).

Plaintiffs reply that Defendants' references to the specification confirm the actual language of the claim. (Dkt. No. 118 at 11). Plaintiffs further argue that Defendants' references provide no support for changing "couple to" to "connected to," or for replacing "configured to" with "utilized," as Defendants propose. (*Id.*)

For the following reasons, the Court finds that the phrase **"executing a first software routine via the at least one processor coupled to said first database and configured to automatically and without human intervention prepare a first electronic communication"** should be given its plain and ordinary meaning.

### b) Analysis

The phrase "executing a first software routine via the at least one processor coupled to said first database and configured to automatically and without human intervention prepare a first electronic communication" appears in asserted claims 1 and 28 of the '744 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the phrase is unambiguous, and is easily understandable by a jury, and should be given its plain and ordinary meaning.

Defendants have failed to provide a persuasive reason for redrafting the disputed phrase. Defendants' references to the specification confirms the actual language of the claim by stating that the processor is "coupled to" the first database, and the "software

routing … [is] executed by the … processor." Thus, there is no support for changing "coupled to" to "connected to," or for replacing "configured to" with "utilized." *K-2 Corp. v. Salomon SA*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee."). Indeed, claim 1 explicitly recites that the "first electronic communication" prepared in Step C is sent in Step D. Accordingly, the Court rejects Defendants' construction.

### c) Court's Construction

The phrase **"executing a first software routine via the at least one processor coupled to said first database and configured to automatically and without human intervention prepare a first electronic communication"** will be given its plain and ordinary meaning.

### 8. "client database," "database containing [client/customer] information," "database of available [clients / persons]

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "client database" | plain and ordinary meaning | "an automated or computerized collection of client records" |
| database containing [client/customer] information" / "database of available [clients / persons] | plain and ordinary meaning | "an automated or computerized collection of client records" |

### a) The Parties' Positions

The parties dispute whether the "database" terms should be construed to mean "an automated or computerized collection of client records," as Defendants propose. Plaintiffs argue that nothing in the intrinsic record redefines these terms as a "computerized collection of client records." (Dkt. No. 114 at 11). Plaintiffs contend that the specification describes a "typical" client database, and that this description is within a portion of the specification that describes "the preferred method and embodiment." (*Id.*) (citing '938 Patent at 6:15–26, 5:28–34).

Defendants respond that their construction comes directly from the specification. (Dkt.

No. 116 at 16) (citing '938 Patent at 6:15–26). Defendants argue that the client records are collected into an automated or computerized database, which is referred to as a client database. (Dkt. No. 116 at 16). Defendants further argue that the clear intent of the patentee was to define terms once and then use those terms throughout the patent. (*Id.*). Defendants also contend that the fact that the client information is "typically" (*i.e.*, not always) collected and organized into a database has no bearing on the definition of the database itself. (*Id.* at 17).

Plaintiffs reply that Defendants' proposal improperly conflates a "client database," with every claimed instance of a "database," "database containing [client/customer] information," and "database of available [clients/persons]." (Dkt. No. 118 at 8). Plaintiffs argue that while the "client database" in the preferred embodiment may be an "automated or computerized database," courts cannot "import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments … or even describes only a single embodiment." (*Id.*) (citing *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005)).

For the following reasons, the Court finds that the term **"client database"** should be construed to mean **"a computerized compilation of information pertaining to clients."** The Court also finds that the terms **"database containing [client/customer] information"** and **"database of available [clients / persons]"** should be construed to mean **"a computerized compilation of information pertaining to [clients/customers/persons]."**

### b) Analysis

The term "client database" appears in asserted claim 52 of the '434 Patent. The terms "database containing [client/customer] information" / "database of available [clients / persons]"

appear in asserted claims 1 and 28 of the '744 Patent; and asserted claim 80, 87, 122, and 123 of the '375 Patent. The Court finds that the terms are used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the term "client database" should be construed to mean "a computerized compilation of information pertaining to clients." The Court also finds that the terms "database containing [client/customer] information" and "database of available [clients / persons]" should be construed to mean "a computerized compilation of information pertaining to [clients/customers/persons]." Regarding the terms "client record" and "client database," the specification provides the following explicit definitions:

> "Client record" as used here means a compilation of information pertaining to a particular client. The client information typically would be collected into an automated or computerized database, which is referred to herein as a "client database." In this context, a client record would be a single record for a given client within the client database.

'938 Patent at 6:15–26. Given the patentee's explicit definitions for the terms "client record" and "client database," a person of ordinary skill in the art would understand that the recited "client database" is "a computerized compilation of information pertaining to clients."

Plaintiffs argue that the specification's reference to "client database" is limited to only a "preferred method and embodiment." (Dkt. No. 118 at 8). The Court disagrees. The specification states that the steps of the claimed invention are performed "in a fully automated or significantly automated manner" and "with little or no human intervention." '434 Patent at 1:6–13, 4:1–2. Indeed, the specification states that "[t]he apparatus and methods according to the invention provide a marked departure from known financial product marketing and sales systems, for example, in that they allow for the virtually complete automation of the tasks traditionally performed by agents and telemarketers in

transacting such marketing and sales." 434 Patent at 3:63-4:1. Accordingly, a person of ordinary skill in the art would understand that the claimed "client database" is "a computerized compilation of information pertaining to clients." Likewise, a person of ordinary skill in the art would understand that the claimed "database containing [client/customer] information" and "database of available [clients / persons]" are "a computerized compilation of information pertaining to [clients/customers/persons]."

### c) Court's Construction

The Court construes the term **"client database"** to mean **"a computerized compilation of information pertaining to clients."** The Court construes the terms **"database containing [client/customer] information"** and **"database of available [clients / persons]"** to mean **"a computerized compilation of information pertaining to [clients/customers/persons]."**

### 9. "each reply"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "each reply" | plain and ordinary meaning | "every communication delivered to the consumer entity in response to client interaction (e.g., client clicking a link on a website)" |

### a) The Parties' Positions

The parties dispute whether "each reply" means that "each and every reply" must be customized. Plaintiffs argue that conditioning the term "each reply" to refer to replies that are "delivered to the consumer entity," would render the different limitation "delivering said replies to corresponding consumer entities" redundant. (Dkt. No. 114 at 13). Plaintiffs also argue that Defendants' construction risks making an otherwise clear term less clear. (*Id.*). Plaintiffs contend that the claim language refers to "one or more responses" from the client, and the specification

does not require that the "reply" correspond to a unique response from a client. (*Id.*). Plaintiffs further argue that Defendants' construction may be interpreted as requiring only one reply for each response. (*Id.*).

Defendants argue that their understanding of the term "each" includes the concept of "every." (Dkt. No. 116 at 20). Based on their understanding of the term "each," Defendants contend that the claims require every responsive communication be customized for the consumer entity. (*Id.*). Defendants argue that Plaintiffs appear to rely on a definition of "each" that does not include the concept of "every." (*Id.*)

Plaintiffs reply that claim 52 of the '938 Patent does not require generating a reply for each response. (Dkt. No. 118 at 10). Plaintiffs contend that claim 52 requires only that "one or more replies" are generated for "at least some of the responses." (*Id.*). According to Plaintiff, Claim 52 leaves open the possibility of other replies that are not subject to the limitations of the claim. (*Id.*).

For the following reasons, the Court find that the term(s) **"each reply"** should be construed to mean **"each of said automatically generated one or more replies."**

### b) Analysis

The term "each reply" appears in asserted claims 1, 52, 184, 226, 266, 308, 309, 310, and 311 of the '938 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. Claim 52 recites "*automatically generating one or more replies* for at least some of the responses or subsequent responses, *each of said replies* being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, *each reply customized for a consumer entity* using other than one or more of name,

address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity." '938 Patent at Claim 52 (emphasis added). As indicated in Claim 52, "one or more replies" provides antecedent basis for "each reply." This means that each of the claimed "automatically generated replies" must be customized for a consumer entity.

The claim language is not confusing or ambiguous. However, to remove any ambiguity and resolve the parties dispute, the Court construes "each reply" to mean "each of said automatically generated one or more replies." The Court rejects Defendants' argument that "each" means "every" or "any or all" communications. Instead, the claims are directed to the recited automatically generated replies.

### c)  Court's Construction

The Court construes the term **"each reply"** to mean **"each of said automatically generated one or more replies."**

### 10. "distinct choices particular to the offering"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "distinct choices particular to the offering" | plain and ordinary meaning | the distinct choices presented by the "one component configured for viewing on a display accessible via the internet" are the same choices sent to the at least certain of the plurality of clients in the other component |

### a)  The Parties' Positions

The parties dispute whether the recited "one component configured for viewing on a display accessible via the internet" are the same choices sent to the "at least certain of the plurality of clients" in the other component. Plaintiffs argue that the phrase "distinct choices particular to the offering" is used in the claims according to its plain meaning. (Dkt. No. 114 at 17). Plaintiffs also argue that there is nothing in the intrinsic record that redefines the phrase. (*Id.*

at 18). Plaintiffs further contend that the specification of the '434 Patent discloses "giv[ing] you the choice of selecting the particular type of coverage that best suits your individual needs." (*Id.*) (citing '434 Patent at Appendix 1A).

Regarding Defendants' construction, Plaintiffs argue that nothing in the intrinsic record requires that the non-internet viewable component of the communication data outputs include the "same choices." (Dkt. No. 114 at 18). Plaintiffs contend that the claim language only requires the communication data output include at least two components. (*Id.*). According to Plaintiffs, the intrinsic record makes clear that "components" should be understood broadly. (*Id.*) (citing '375 Patent at 9:65–67, 30:6–10).

Defendants respond that the term "distinct choices particular to the offering" as used in the '184 Patent must mean that the distinct choices presented by the "one component configured for viewing on a display accessible via the internet" are the same choices sent to the at least certain of the plurality of clients in the other component. (Dkt. No. 116 at 20). Defendants argue that the clients cannot select a distinct choice from the distinct choices particular to the offering, unless the one component sent to them contains these distinct choices. (*Id.* at 21). According to Defendants, the "one component" sent to the clients in that claim must be the one component "configured for viewing on a display accessible via the internet and contains [the] distinct choices particular to the offering." (*Id.*).

Plaintiffs reply that there is nothing in any of the independent claims that specify what distinct choices, if any, are contained in the other, non-internet, component. (Dkt. No. 118 at 10). According to Plaintiffs, only the "component … configured for viewing on a display accessible via the internet" must "contain [] distinct choices particular to the offering." (*Id.*).

For the following reasons, the Court finds that the phrase **"distinct choices particular to**

**the offering"** should be given its plain and ordinary meaning.

The phrase "distinct choices particular to the offering" appears in asserted claim 1 of the '184 Patent. Claim 1 recites that "the communication data outputs comprise at least two components." The claim then introduces the term "distinct choices" by reciting "wherein one component [of the at least two components of the communication data outputs] is configured for viewing on a display accessible via the internet by clients and contains distinct choices particular to the offering." The next step of claim 1 recites "sending one component of the communication data outputs to at least certain of the plurality of clients." The claim then recites "receiving . . . one or more responsive communications from the certain clients to the offerings, the responsive communications responding to at least one of the one component configured for viewing on a display accessible via the internet." The claim further recites that the responsive communications includes "an initial communication indicating a distinct choice selected by the certain clients."

As indicated, the plain language of the claim recites that there are at least two components. One component is configured for viewing on a display accessible via the internet, and the other component is not so limited. Contrary to Defendants' contention, nothing in the intrinsic record requires that the non-internet viewable component of the communication data outputs include the "same choices." The specification states that the communication format includes at least one variable that "may assume any one or combination of a wide variety of informational types and content components." '184 Patent at 11:1–2. The independent claim does not specify what distinct choices, if any, are contained in the other, non-internet component. Instead, only the "component … configured for viewing on a display accessible

via the internet" must "contain [] distinct choices particular to the offering." Accordingly, the Court rejects Defendants' construction.

### c) Court's Construction

The phrase **"distinct choices particular to the offering"** will be given its plain and ordinary meaning.

11. **"responses [… being in response] to [said] [combined] [mass marketing] communications [relating to offerings for one or more financial products or services]," "responsive communications from the certain clients to the offerings," "responsive communication data outputs are composed using at least certain variable data specific to the certain clients," "the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| (a) "responses [… being in response] to [said] [combined] [mass marketing] communications [relating to offerings for one or more financial products or services]" | plain and ordinary meaning | (a): responses from the consumer entities that indicate the particular offering contained in the [combined] [mass marketing] communication |
| (c) "responsive communications from the certain clients to the offerings" | plain and ordinary meaning | (c): responsive communications from the certain clients that indicate the particular offering contained in the communication data outputs |
| (b) "responsive communication data outputs are composed using at least certain variable data specific to the certain clients" | plain and ordinary meaning | (b): a reply to the client composed using variable, client-specific data obtained from the one or more databases |
| (d) "the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients" | plain and ordinary meaning | (d): communication from the client indicating the distinct choice selected from among the choices provided in the first communication sent to the client |

### a) The Parties' Positions

The parties dispute whether the "responses" and "responsive" phrases requires the

additional limitations proposed by Defendants. Plaintiffs contend that a response is simply a communication that responds to another communication. (Dkt. No. 114 at 25). Plaintiffs argue that the applicant expressly adopted the plain meaning of the term. (*Id.* at 27) (citing '938 Patent at 7:56–58).

Plaintiffs further argue that Defendants' proposals (a) and (c) ignore the express definition of "response," and seek to impose an additional requirement that the "response" "indicate the particular offering contained in the" original communication. (Dkt. No. 114 at 26). Plaintiffs contend that claim 52 of the '938 Patent requires only that the "response" comprise a "nonpurchase request." (*Id.*) According to Plaintiffs, a "nonpurchase request" can include a generic "request for further information, a request for a modified product, a request for a different type of quotation, and the like." (*Id.*) (citing '938 Patent at 3:9–12). Plaintiffs further contend that claim 1 of the '184 Patent requires only that the response indicate a distinct choice selected by the client, and that distinct choice is used in an ordinary manner without specific restriction on the type of choices. (Dkt. No. 114 at 26).

Regarding Defendants' proposal (b), Plaintiffs argue that there is no sound reason for rearranging the claim language "composed using at least certain variable data specific to the certain clients" to Defendants' formulation of "composed using variable client-specific data ...." (*Id.*). Plaintiffs also argue that including a requirement that the variable data be "obtained from the one or more databases," ignores and renders superfluous the earlier claim limitation that "responsive communication data outputs contain[] data obtained from the one or more databases." (*Id.*)

Regarding Defendants' proposal (d), Plaintiffs argue that it should be rejected for the same reasons as discussed regarding the disputed term "initial communication." (*Id.*). Plaintiffs

further argue that the plain language of the claim requires only that the initial communication "indicat[e] a distinct choice," and says nothing about the indicated distinct choice being the same as earlier offered choices. (*Id.*).

Defendants respond that the relevant claims are directed to a back-and-forth with the client, in which an initial marketing communication is sent to the client, the client sends a response to the initial communication, and then a reply to that response is sent back to the client. (Dkt. No. 116 at 21) (citing '938 Patent at 7:56–8:12). Regarding their proposal (a), Defendants argue that the specification defines the phrase as a communication from a client given in response to an original 'client communication' sent to that particular client. (Dkt. No. 116 at 22). Defendants contend that to be a responsive communication, the communication must somehow indicate that it is responding to the mass marketing communication. (*Id.*). Defendants argue that their construction does not limit the manner in which such indication is made. (*Id.* at 23). Defendants further contend that the indication could be a selection of response options, for example, "buy," "more information," "different amount," etc., depending upon the nature of the product or service being marketed. (*Id.*). Defendants also argue that their definition is consistent with the Abstract of the patents-in-suit. (*Id.*) (citing '938 Patent at Abstract).

Regarding their proposal (b), Defendants contend that the dispute centers on how the replies are generated. (Dkt. No. 116 at 23.) Defendants argue that the specification suggests that the variable data comes from the one or more databases. (*Id.* at 24) (citing '184 Patent at 33:24–25, 33:45–48). According to Defendants, the only place disclosed in the specification to store the client variable data is in the client database 2000. (*Id.*). Defendants argue that their clarification is important because the accused system has no client database at all and does not generate any replies "using variable data specific to the certain clients." (*Id.*) Defendants further contend that

the spirit of the patent relies extensively on a client database throughout the disclosure to customize and personalize communications. (*Id.* at 25). Defendants further argue that Figure 19 indicates that the system uses a client database to compose the customized reply. (*Id.*) (citing '184 Patent at 31:25–34, 31:36–40). Finally, Defendants contend that "specific to the certain clients" suggests that the data is specific to a particular person and not simply information entered or selected by a random website visitor. (Dkt. No. 116 at 26).

Regarding their proposal (c), Defendants argue that the term "responsive communications from the certain clients to the offerings" is defined in the specification to mean a responsive communications from the certain clients that indicate the particular offering contained in the communication data output. (*Id.*). According to Defendants, the clients' responses reflect the clients' selections from the choices presented to them in the offer communications received by the clients. (*Id.*)

Regarding their proposal (d), Defendants argue that the term "the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients" is defined in the specification to mean communication from the client indicating the distinct choice selected from among the choices provided in the first communication sent to the client. (*Id.*). Defendants argue that the "distinct choice" selected by the client (and included in the client's response) is a selection from among the distinct choices provided in the initial communication sent to them. (*Id.* at 27) (citing '184 Patent at 30:14–41, Figure 18). Defendants further contend that the word "initial" in the term itself implies that the distinct choice comes from the "initial" or first communication sent to the client, *i.e.*, the "initial offer" in step 1000 in Figure 18. (Dkt. No. 116 at 28).

Plaintiffs reply that the specification clearly provides that "'response' refers to a

communication from a client in response to an original 'client communication' sent to that particular client or a reply communication." (Dkt. No. 118 at 13) (citing '938 Patent at 7:56–58). According to Plaintiffs, there is no additional restriction placed on the meaning of "response." (Dkt. No. 118 at 13). Plaintiffs further contend that terms (a) and (c) do not impose the additional requirements that the response "indicate the particular offering contained in the [original] communication." (*Id.*). Plaintiffs argue that the claim limitations simply require that the response "be [] in response to mass marketing communications" or be "responsive … to the offerings." (*Id.*) (citing '938 Patent at 34:29–30, 34:66–35:4). Plaintiffs also contend that indicating that the response is responding to the mass marketing communication is different than "indicat[ing] the particular offering," as Defendants' proposal requires. (Dkt. No. 118 at 13).

Regarding Defendants' proposal (b), Plaintiffs argue that it rewrites the claim based not on the actual intrinsic record, but on Defendants' non-infringement arguments. (Dkt. No. 118 at 14). Plaintiffs argue that the intrinsic record provides only that the responsive communication be composed "using … variable data specific to the certain clients." (*Id.*). According to Plaintiffs, variable data specific to the client is different than Defendants' proposal of variable and client specific data. (*Id.*). Plaintiffs further argue that there is also no basis to add a limitation on where the variable data is obtained. (*Id.*). Plaintiffs contend that a different limitation indicates that "data" is "obtained from the one or more databases." (*Id.*).

Regarding Defendants' proposal (d), Plaintiffs argue that the claim language requires only that the response "indicat[e] a distinct choice." (Dkt. No. 118 at 14). Plaintiffs contend that the claim language does not limit the "indicat[ed] distinct choice" to only one of the distinct choices presented in the original communication. (*Id.*). Plaintiffs further argue that Figure 18 is a "non-limiting illustrative embodiment." (118 at 14) (citing '184 Patent at 30:17).

For the following reasons, the Court find that the phrases **"responses [… being in response] to [said] [combined] [mass marketing] communications [relating to offerings for one or more financial products or services]"** and **"responsive communications from the certain clients to the offerings"** should be given its plain and ordinary meaning. The Court also finds that phrase **"responsive communication data outputs are composed using at least certain variable data specific to the certain clients"** should be given its plain and ordinary meaning. The Court further finds that the phrase **"the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients"** should be construed to mean **"an initial communication from the client indicating the distinct choice selected from one of the presented communications sent to the client."**

### b) Analysis

The phrase "responses [… being in response] to [said] [combined] [mass marketing] communications [relating to offerings for one or more financial products or services]" appears in asserted claims 184, 226, 266, and 311 of the '938 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The phrases "responsive communications from the certain clients to the offerings," "responsive communication data outputs are composed using at least certain variable data specific to the certain clients," and "the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients" appear in asserted claims 1 of the '184 Patent.

Regarding term (d), the claim language does not recite that the "indicat[ed] distinct choice" can only be one of the distinct choices presented in the original communication. Instead, the claim language recites that the responsive communications is an initial communication.

During the claim construction hearing, Defendants argued that "initial" communication means the first communication sent from the client to business. The Court agrees and finds that this is clearly stated in the claim.

Defendants also argued that the "select choice" has to be from the first communication sent to the client. The Court disagrees. Claim 184 explicitly recites that the initial communication can be from any "subsequent communication presented," and is not limited to first communication presented to the client. Defendants further argue that Figure 18 indicates that the "distinct choice" selected by the client is a selection from among the distinct choices provided in the initial communication sent to the client. Defendants are correct that this is what is illustrated in Figure 18. However, the specification states that Figure 18 is "non-limiting illustrative embodiment." '184 Patent at 30:17. It would be improper to limit the claims to this embodiment, as Defendants propose. Accordingly, the Court construes the phrase "the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients" to mean "an initial communication from the client indicating the distinct choice selected from one of the presented communications sent to the client."

Regarding terms (a) and (c), the claim limitations only recite "responses to mass marketing communications" or "responsive … to the offerings." Defendants' construction redrafts the claim and requires the response to indicate that it is to a particular offering. The words "particular offering" do not appear in the claims. Moreover, Defendants' argument that "[t]o be a responsive communication, the communication must somehow indicate that it is responding to the mass marketing communication," does not explain their proposal. Indicating that the response is responding to the mass marketing communication is different from "indicat[ing] the particular offering," as Defendants' construction requires.

Defendants argue that the Abstract of the '938 Patent states that "[t]o facilitate automation and tracking, each original communication to the client (or each original response from the client) is tagged with a unique label, and replies to client responses are each correspondingly labeled." (Dkt. No. 116 at 23) (citing '938 Patent at Abstract). The asserted claims do not recite a "label." Indeed, it is dependent claim 189 of the '938 Patent that recites "wherein each response comprises a unique label." Accordingly, the Court rejects Defendants' construction and finds that the phrases should be given their plan and ordinary meaning.

Regarding term (b), the claim language recites that the responsive communication is composed "using … variable data specific to the certain clients." Variable data specific to the client is different than Defendants' proposal of variable and client specific data. The Court also agrees with Plaintiffs that there is no basis to add a limitation on where the variable data is obtained. Claim 1 of the '184 Patent separately recites "automatically generating, using the at least one processor, one or more responsive communication data outputs containing data obtained from the one or more databases." The Court finds that Defendants' construction is unwarranted and improperly redrafts the clear and unambiguous claim language. Accordingly, the Court rejects Defendants' construction and finds that the phrases should be given their plan and ordinary meaning.

### c) Court's Construction

The phrases **"responses [… being in response] to [said] [combined] [mass marketing] communications [relating to offerings for one or more financial products or services]"** and **"responsive communications from the certain clients to the offerings"** will be given their plain and ordinary meaning. The phrase **"responsive communication data outputs are composed using at least certain variable data specific to the certain clients"** will

also be given its plain and ordinary meaning. The Court construes the phrase **"the responsive communications comprising an initial communication indicating a distinct choice selected by the certain clients"** to mean **"an initial communication from the client indicating the distinct choice selected from one of the presented communications sent to the client."**

### 12. "compliance and/or regulatory"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "compliance and/or regulatory" | plain and ordinary meaning | indefinite |

#### a) The Parties' Positions

The parties dispute whether the phrase "compliance and/or regulatory" is indefinite for failing to particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2. Plaintiffs argue that Defendants have failed to carry their burden of proving that the disputed term is indefinite. (Dkt. No. 114 at 27). Plaintiffs further argues that "compliance and/or regulatory" information is not a technical term. (*Id.*). Plaintiffs contend that the intrinsic record confirms that the terms have a plain and ordinary meaning. (*Id.*) (citing '735 Patent at Abstract, 29:25–28, 29:30–36, 29:46–49). Plaintiffs further contend that the intrinsic record's reference to jurisdictions, the financial product/service, and the recipient's address, etc., confirms that the term is used in its ordinary manner. (Dkt. No. 114 at 27). According to Plaintiffs, a person of ordinary skill in the art would understand that certain states impose certain compliance or regulatory requirements on financial products such as health insurance, or loans, and would be familiar with the practice of including such information in the "fine print." (*Id.* at 28).

Defendants respond that other than in the Abstract of U.S. Patent No. 8,073,735 ("the '735 Patent"), the only place this phrase appears is in the claims of the '735, '366, '375, and '435 Patents. (Dkt. No. 116 at 28). Defendants argue that the intrinsic record fails to provide any

guidance as to the type of "compliance and/or regulatory" information that might be included in the scope of the claims. (*Id.* at 29). Defendants further argue that the term "compliance and/or regulatory" is not a term of art and has no ordinary meaning to a person of ordinary skill in the art. (*Id.*).

Plaintiffs reply that the Abstract and claims provide that compliance and/or regulatory information may depend on the financial product or service, company, jurisdiction, or recipient's address. (Dkt. No. 118 at 14). Plaintiffs argue that common terms, such as the one at issue, do not require further explication. (*Id.*).

For the following reasons, the Court finds that the term **"compliance and/or regulatory"** is indefinite because it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### b) Analysis

The term "compliance and/or regulatory" appears in asserted claims 70 and 96 of the '366 Patent; asserted claims 4 and 19 of the '435 Patent; and asserted claim 94 of the '375 Patent. Other than in the Abstract of the '735 Patent, the only place the term "compliance" appears is in the claims of the '735, '366, '375, and '435 Patents. The Abstract of the '735 Patent states that "[t]he compliance information can vary on each document depending on the particular financial product and/or financial service, and based on both company and jurisdictional requirements." '735 Patent at Abstract.

This one sentence does not inform, with reasonable certainty, those skilled in the art about the scope of the invention. Instead, it adds further uncertainty by tying the term to "company and jurisdictional requirements." *Litton Sys. v. Honeywell, Inc.*, 145 F.3d 1472, 1474 (Fed. Cir. 1998) ("Public notice of the scope of the right to exclude, as provided by the patent claims,

specification and prosecution history, is a critical function of the entire scheme of patent law. The notice function is critical because it provides competitors with the necessary information upon which they can rely to shape their behavior in the marketplace."). Moreover, the claims do not provide any additional context that would cure the terms indefiniteness of the term.

### c) Court's Construction

The term **"compliance and/or regulatory"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### 13. "data outputs comprise [of] at least two components"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "data outputs comprise [of] at least two components" | plain and ordinary meaning | indefinite |

### a) The Parties' Positions

The parties dispute whether the phrase "data outputs comprise [of] at least two components" is indefinite for failing to particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2. Plaintiffs argue that Defendants have failed to carry their burden of proving that the disputed phrase is indefinite. (Dkt. No. 114 at 27). Plaintiffs contend that the claims themselves refer to data outputs that "comprise at least two components, wherein one component is configured for viewing on a display accessible via the internet by clients …." (*Id.* at 28). Plaintiffs argue that the claim language is clear that the communication data outputs must include at least two components, and the specification discloses that "components" is a broad term. (*Id.*) ('375 Patent at 9:65–67, 30:6–10).

Defendants contend that a person of ordinary skill in the art would not be reasonably certain of the meaning of the phrase "data outputs comprise at least two components" because it is unclear whether (1) each data output comprises at least two components, or (2) the data

outputs collectively comprise at least two components. (Dkt. No. 116 at 29). Defendants argue that in the first instance, a first data output may comprise a first component and a second component, and a second data output may also comprise a first component and a second component. (*Id.*). Defendants contend that in the second instance, one data output may comprise a first component while another data output comprises a second component. (*Id.*).

Defendants further argue that the term "data outputs" is only used in the '184 Patent claims, and the language of the claims fails to clarify the meaning of this phrase. (*Id.* at 30). Defendants contend that the claims specify that "one component is configured for viewing on a display accessible via the internet by clients," but fail to provide any information regarding the second component. (*Id.*). Defendants further argue that the claims recite "sending one component of the communication data outputs to at least certain of the plurality of clients." (*Id.*). According to Defendants, a person of ordinary skill in the art would not be reasonably certain whether this "one component" that is sent to the at least certain of the plurality of client is the same as or different from the "one component" that "is configured for viewing." (*Id.*). Finally, Defendants argue that the claims recite "at least one of the one component configured for viewing …," which suggests there are multiple "one components" configured for viewing on a display accessible via the internet …." (*Id.* at 30).

Plaintiffs reply that the claims provide that the "data outputs comprise at least two components," and require that one of those components "is configured for viewing on a display accessible via the internet." (Dkt. No. 118 at 15). Plaintiffs also argue that Defendants contend that the term is indefinite because there are no details on the other component (*i.e.*, second of two component). (*Id.*). Plaintiffs contend that this indicates that the claim is open ended as to the other component. (*Id.*).

For the following reasons, the Court finds that the phrase **"data outputs comprise [of] at least two components"** should be given its plain and ordinary meaning.

### b)  Analysis

The phrase "data outputs comprise [of] at least two components" appears in asserted claim 1 of the '184 Patent. In the context of the intrinsic evidence, the Court finds that the phrase is not indefinite. The Court further finds that the phrase does not require construction because it is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. For example, claim 1 recites "automatically generating . . . communication data outputs for a plurality of clients, . . . wherein the communication data outputs comprise at least two components." Claim 1 further recites that "one component is configured for viewing on a display accessible via the internet." The claim then recites "sending one component of the communication data outputs to at least certain of the plurality of clients," and "receiving . . . one or more responsive communications from the certain clients to the offerings, the responsive communications responding to at least one of the one component configured for viewing on a display accessible via the internet." As the claim language indicates, the recited "at least two components" is referring to the "data outputs." Simply stated, the claim language requires each "data output" to include "at least two components," because these are the outputs automatically generated "for a plurality of clients."

Defendants argue that the phrase is indefinite because it is unclear whether (1) each data output comprises at least two components, or (2) the data outputs collectively comprise at least two components. (Dkt. No. 116 at 29). As discussed, the claim language recites that the automatically generated communication data outputs "comprise at least two components." Again, the claim language requires each "data output" to include "at least two components,"

with "one component configured for viewing on a display accessible via the internet."

Defendants contend that the claims specify that "one component is configured for viewing on a display accessible via the internet by clients," but fail to provide any information regarding the second component. (Dkt. No. 116 at 30). As Plaintiffs contend, this indicates that the claim is open ended as to the other component. This is consistent with the specification's characterization of "components." '375 Patent at 9:65–67 ("The variable may assume anyone or combination of a wide variety of informational types and content components."), *id.* at 30:6-10 ("The method of claim 1, wherein said variable data included in said customized content comprises at least one of textual components, alphanumeric components, and graphical components is varied between consumer entities."); '184 Patent at 35:50-52 ("A method according to claim 1, wherein the component configured for viewing on a display accessible via the internet is a display advertisement."). Accordingly, the Court finds that the phrase "data outputs comprise [of] at least two components" informs, with reasonable certainty, those skilled in the art about the scope of the invention.

### c) Court's Construction

The phrase **"data outputs comprise [of] at least two components"** is not indefinite and will be given its plain and ordinary meaning.

### 14. "other than one or more of [name, address and account number]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "other than one or more of [name, address and account number]" | plain and ordinary meaning | indefinite |

### a) The Parties' Positions

The parties dispute whether the phrase "other than one or more of [name, address and account number]" is indefinite for failing to particularly point out and distinctly claim the subject

matter regarded as the invention. 35 U.S.C. § 112 ¶ 2. Plaintiffs argue that Defendants have failed to carry their burden of proving that the disputed term is indefinite. (114 at 27) Plaintiffs further argue that the phrase simply excludes certain information from reply communications. (114 at 28) According to Plaintiffs, claim 184 of the '938 Patent excludes the use a name, address, or account number to customize a reply. (114 at 28)

Defendants respond that the '938 Patent specification repeatedly indicates that the term "other than" is associated with the term "in addition to." (116 at 30) (citing '938 Patent at 13:47–48, 13:57–58, 15:1–2). According to Defendants, "other than" could instead require using something "in addition to" using name, address, and account number to customize a reply." (116 at 31) Defendants also argue that the meaning of "other than" is even more unclear when incorporated into the entire phrase "other than one or more of." (116 at 31) Defendants also argue that the plain meaning of "in addition to" implies that something besides name, address, and account number is required to customize the reply. (116 at 31) Defendants contend that the "one or more" language makes it unclear whether the plain meaning of "in addition to" applies. (116 at 31) According to Defendants, the limitation may be met if only name and address are used to customize a reply because name is "in addition to" address (which is one of name, address, and account number). (116 at 31)

Plaintiffs reply that the claim language makes clear that the reply is "customized … using other than one or more of name, address and account number." (118 at 15) Plaintiffs argue that the language makes sense since a name, address or account number might otherwise be "customized" since an account number would likely be different between consumers. (118 at 15) According to Plaintiffs, the patentee drafted the claim to make clear that "customized" in this instance requires the use of information "other than one or more of" a name, address, and

account number. (118 at 15)

For the following reasons, the Court find that the phrase **"other than one or more of [name, address and account number]"** should be construed to mean **"something that is not a name, an address, or an account number"**

b) **Analysis**

The phrase "other than one or more of [name, address and account number]" appears in asserted claims 1, 52, 184, 226, 266, 308, 309, 310, and 311 of the '938 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the phrase is not indefinite, because it informs, with reasonable certainty, those skilled in the art about the scope of the invention.

The specification states that "'[c]lient identification' as used herein includes the information about the client which uniquely identifies a given client and permits correspondence or communications to be forwarded to the client." '938 at 11:55-58. The specification further states that "[i]n most instances this client identification constitutes the client's name, or the client's name and post office address. A client account number also may be included." '938 at 11:58-61. Here the claims refer to the listed examples of client identification information (*i.e.*, name, address and account number).

Regarding the term "other than," when referring to the client identification or the client identification information, the specification repeatedly indicates that the term "other than" is associated with the term "in addition to," or something that is not a name, an address, or an account number. *See, e.g.*, '938 at 13:46-49 ("This variable information preferably includes information *other than, or in addition to, a client identification* as that term has been defined herein.") (emphasis added); '938 at 13:55-59 ("This variable

information may comprise virtually any form of client information, but preferably, as noted, it would be *other than, e.g., in addition to, a client identification, most notably the client's name, address, account number, etc.*") (emphasis added); '938 at 14:65-15:2 ("The apparatus according to the invention comprises means for inputting into a computer-accessible storage medium variable information comprising *other than (in addition to) a client identification* and decision information.") (emphasis added). Thus, a person of ordinary skill in the art would understand the phrase to mean "something that is not a name, an address, or an account number."

Plaintiffs argue that the phrase simply excludes certain information from reply communications. (Dkt. No. 114 at 28). As discussed above, that is not how a person of ordinary skill would interpret the claim language. Instead, the claim requires customizing the reply using "something that is not a name, an address, or an account number." Defendants contend that the "one or more" language makes it unclear whether the plain meaning of "in addition to" applies. (116 at 31) The Court disagrees. As discussed above, the specification repeatedly indicates that the term "other than" means something that is not a name, an address, or an account number.

### c) Court's Construction

The Court construes the phrase **"other than one or more of [name, address and account number]"** to mean **"something that is not a name, an address, or an account number"**

### 15. "particular type of [financial] product or service," "particular type of [financial] product or service [or variant thereof]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "particular type of [financial] product or service" | plain and ordinary meaning | indefinite |

| "particular type of [financial] product or service [or variant thereof]" | plain and ordinary meaning | indefinite |

### a) The Parties' Positions

The parties dispute whether the phrases "particular type of [financial] product or service" and "particular type of [financial] product or service [or variant thereof]" are indefinite for failing to particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2. Plaintiffs argue that Defendants have failed to carry their burden of proving that the disputed phrases are indefinite. (Dkt. No. 114 at 27). Plaintiffs contend that the phrase is used in the claim language to refer to "communications comprising offerings for [a] particular type of financial product or service or variant thereof …." (*Id.* at 28). Plaintiffs further contend that the term "financial products or services" is a broad phrase that refers to any financially-related product or service. (*Id.*). According to Plaintiffs, including "variant[s] thereof" does not render the limitation unclear. (*Id.*). Plaintiffs also contend that the intrinsic record provides examples of variants of particular types of financial products or services. (*Id.*) (citing '114 Patent at 22:21–26).

Defendants respond that a person of ordinary skill in the art would not be reasonably certain of the meaning of the phrase "a particular type of product or service" because the preamble of the claims recites "a financial product or service." (Dkt. No. 116 at 31). Defendants argue that it is unclear whether "a particular type" means "financial" (*i.e.*, this phrase should be read as "financial product or service") or whether "a particular type" means a specific type or subset of "financial product[s] or service[s]." (*Id.*).

Defendants further argue that a person of ordinary skill in the art would not be reasonably certain of the meaning of the phrase "particular type of financial product or service or variant thereof" because the intrinsic record provides no standard for measuring the degree of variation

in the "particular type of financial product or service." (*Id.* at 32). Defendants contend that the '938 Patent specification makes no mention of the term "variant," and provides no definition or clarification of how much or what kind of variation is acceptable. (*Id.*). According to Defendants, Plaintiffs have failed to provide any standard for determining how much or what kind of variation falls within the scope of the claims. (*Id.*).

Plaintiffs reply that a "particular type" of financial product simply refers to a mortgage loan, as opposed to a generic loan. (Dkt. No. 118 at 15). Plaintiffs also argue that the preamble is not limiting, and the recited "product or service" encompasses a broader range of products and services than the "financial products or service" recited in the preamble. (*Id.*). Plaintiffs further contend that the reference to "variant" does not render the term indefinite. (*Id.* at 16). Plaintiffs argue that Defendants' reliance on *Interval Licensing LLV v. AOL, Inc.*, 766 F.3d 1364, 1372 (Fed. Cir. 2014), is misplaced because the case does not mention the term "variant." (*Id.*). According to Plaintiffs, a "variant" of a particular type of financial product or service is not ambiguous. (*Id.*).

For the following reasons, the Court finds that the phrase **"particular type of [financial] product or service"** should be given its plain and ordinary meaning. The Court further finds that the phrase **"particular type of [financial] product or service [or variant thereof]"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### b)  Analysis

The phrase "particular type of [financial] product or service" appears in asserted claims 1 a n d 2 8 of the '184 Patent; and asserted claim 184 of the '938 Patent. The Court finds that the p h r a s e is used consistently in the claims and is intended to have the same meaning in

each claim.  The phrase "particular type of [financial] product or service [or variant thereof]" appears in asserted claim 184 of the '938 Patent.

Regarding the phrase "particular type of [financial] product or service," the Court finds that the phrase is not indefinite. The Court further finds that the phrase does not require construction because it is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. For example, the preamble of claim 1 of the '184 Patent recites "communication data outputs for plurality of clients relating to a financial product or service." Claim 1 further recites that "the communication data outputs comprising an offering for a particular type of product or service." As indicated below, the Court finds that the preamble of the asserted claims 1 and 28 of the '184 Patent; and asserted claim 184 of the '938 Patent is limiting. Thus, when considered in the context of the entire claim, "a particular type" means a specific type of "financial product[s] or service[s]."

Regarding the phrase "particular type of [financial] product or service [or variant thereof]," the Court finds that the phrase is indefinite because it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. The Court agrees with Defendants that the intrinsic record provides no standard for measuring the degree of variation in the "particular type of financial product or service." *Litton Sys. v. Honeywell, Inc.*, 145 F.3d 1472, 1474 (Fed. Cir. 1998) ("Public notice of the scope of the right to exclude, as provided by the patent claims, specification and prosecution history, is a critical function of the entire scheme of patent law. The notice function is critical because it provides competitors with the necessary information upon which they can rely to shape their behavior in the marketplace.").

The '938 Patent specification does not mention the term "variant." Furthermore, the

specification does not provide a definition or clarification of how much or what kind of variation is acceptable. Plaintiffs do not provide any indication on how a person of ordinary skill in the art would determine how much or what kind of variation falls within the scope of the claims. Instead, Plaintiffs rely on a single example to support its argument that the term is not indefinite. (Dkt. No. 114 at 28). However, this example does not inform, with reasonable certainty, those skilled in the art about the scope of the invention. Instead, it points to a "particular type of [financial] product or service," and not a "variant thereof." Accordingly, the Court finds that the phrase "particular type of [financial] product or service [or variant thereof]" is indefinite.

### c) Court's Construction

The phrase **"particular type of [financial] product or service"** will be given its plain and ordinary meaning. The phrase **"particular type of [financial] product or service [or variant thereof]"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### 16. "financial product[s] [and/or] [financial] services"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "financial product[s] [and/or] [financial] services" | "any financially-related product, service or plan" | "products, services, or plans relating to insurance, banking, securities and investment, pricing information, assurance, money saving, and the like (a coupon or discount on the price of a tangible product is not a financial product or financial service by itself)" |

### a) The Parties' Positions

The parties dispute whether the term(s) "financial product[s] [and/or] [financial] services" should be construed to mean "any financially-related product, service or plan," as Plaintiffs propose, or if it should be construed to mean "products, services, or plans relating to insurance, banking, securities and investment, pricing information, assurance, money saving, and

the like," as Defendants propose. Defendants also propose the negative limitation of: "A coupon or discount on the price of a tangible product is not a financial product or financial service by itself," as included in the Court's previous construction for this term(s) in the 1081 case.

Plaintiffs contend that term "financial product" (and variations thereof) should be construed consistent with the broad and ordinary meaning included in the specification. (Dkt. No. 114 at 19). Plaintiffs argue that the specification states that "'[f]inancial product' as the term is used herein is used in its broad sense to include any financially-related product, service or plan." (*Id.* at 19) (citing '938 Patent at 6:56–58; '184 Patent at 6:49–51; '114 Patent at 6:56–58; '375 Patent at 6:33–35; '744 Patent at 6:36–38; and '366 Patent at 6:33–35). Plaintiffs also argue that the '434 Patent uses the term in its broad sense, encompassing "insurance of all types, . . . annuities of all types, . . . and the like," but "not necessarily limited to th[o]se products." (Dkt. No. 114 at 19) (citing '434 Patent at 5:50–67). Plaintiffs further contend that the '434 Patent expressly provides that "[t]he variety of financial products, even for a given need, is substantial," and that "[f]inancial products . . . also may include other forms of financial instruments." (Dkt. No. 114 at 19) (citing '434 Patent at 2:34–36, 5:56–57). Plaintiffs argue that the Asserted Patents provide numerous examples of financial products, emphasizing the broad scope of "financial products." (Dkt. No. 114 at 19) (citing '938 Patent at 6:56–7:10, 14:16–48).

Plaintiffs further contend that the claim language confirms that the term "financial product" is used in its broad sense. (Dkt. No. 114 at 19). Plaintiffs argue that during reexamination, the patentee narrowed claims 14, 20, 41, and 47 of the '434 Patent by replacing the term "financial product" with "life insurance product." (*Id.* at 20) (citing Dkt. No. 114-17 at 2-7, 12) (Nov. 11, 2006 Remarks). Plaintiffs also argue that the extrinsic evidence is consistent with the applicant's broad understanding of the term "financial product." (Dkt. No. 114 at 20).

Plaintiffs further argue that Defendants' construction impermissibly excludes "coupons or discounts . . . ." (*Id.*). Plaintiffs contend that many of the asserted patents expressly refer to "assurance products and money saving products such as . . . warranty plans (home, automobiles, electronics, etc.); discount clubs or programs (dental, travel, etc.); extended warranty plans; and the like." (*Id.* at 21) (quoting '938 Patent at 14:44–48; '184 Patent at 14:21–25; '114 Patent at 14:36–40).

Defendants did not properly present arguments regarding the construction of this term. (Dkt. No. 116 at 3-4).

For the following reasons, the Court find that the term **"financial product[s] [and/or] [financial] services"** should be construed to mean **"financially-related products, services, or plans relating to insurance, banking, securities and investment, assurance, money saving, and the like. A coupon or discount on the price of a tangible product is not a financial product or financial service by itself."**

### b) Analysis

The term(s) "financial product[s] [and/or] [financial] services" appears in asserted claims 1, 2, 22, 48, 66, 69, 109, 119, and 122 of the '434 Patent; asserted claims 1, 52, 184, 226, 266, 308, 309, 310, and 311 of the '938 Patent; asserted claims 80, 87, 122, and 123 of the '375 Patent; asserted claims 1, 28, and 29 of the '744 Patent; asserted claims 1, 28, 60, 90, and 113 of the '366 Patent; asserted claim 1 of the '184 Patent; and asserted claims 13, 17, 18, 19, 23, and 29 of the '114 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the specification of the '434 Patent and the specification of the '938 Patent provide an explicit definition of the disputed term. Specifically, the '434 Patent defines "financial products" as follows:

Financial products as the term is used in this document refers to *insurance products* such as individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, and the like. Financial products, however, also may include *other forms of financial instruments.*

'434 Patent at 5:52–57 (emphasis added). Similarly, the '938 Patent defines "financial products" as follows:

"Financial product" as the term is used herein is used in its broad sense to include any financially-related product, service or plan. The term would include, for example, *insurance products and services, banking products and services, securities and investment products and services, and the like.* Examples of insurance products would include individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, disability insurances of all types, annuities or other timed payment vehicles, and the like. Examples of banking products would include savings-related products and services, demand deposit products and services, loan products and services, credit-related products, etc. Securities and investment products and services would include equity securities, debt securities, mutual funds, money markets, derivatives, etc.

'938 Patent at 6:56–7:3 (emphasis added). The '938 Patent further states:

As noted, the variable financial product information may pertain to a single financial product or to a plurality of different financial products. The variable financial product information may comprise or pertain to, for example, one or more *insurance-related products.* Examples would include property and casualty insurance products, as well as non-property and non-casualty insurance products. The latter grouping would include individual life insurance products such as individual term life insurance products and individual life insurance products other than term, such as permanent life insurance products. Permanent life insurance products would include such things a whole life, universal life, and the like. Where combinations of insurance products are included, they may include, for example, a combination of an individual term life insurance product and an individual permanent life insurance product. Other types of insurance products to which the variable information may pertain include credit life, disability, and unemployment insurance; health insurance products; disability insurance products; annuities; etc.

The variable financial product information also may comprise or pertain to *bank- related products* such as information on various types of demand deposit accounts, savings accounts and product, loan products, credit products, etc. Where the variable financial product information pertains to *financial investments or brokerage-type products*, the information may

comprise or pertain to various investment products, financial securities, equity instruments such as common and/or preferred stocks, stock options, warrants and the like, debt instruments, money market funds, mutual funds, derivatives, etc. The variable financial information may comprise or pertain to financial product pricing information or financial product non-pricing information, or both.

The variable financial information may also include *assurance products and money saving products* such as information on warranty plans (home, automobile, electronics, etc.); discount clubs or programs (dental, travel, etc.); extended warranty *plans*; and the like.

'938 Patent at 14:14-48 (emphasis added). As indicated above, the specification indicates that a "financial product[s] [and/or] [financial] services" include insurance products and services, banking products and services, securities and investment products and services, assurance products and services, money saving products and services, and the like.

The specification provides a number of examples of each of these types of products and services. For example, the specification states that "[e]xamples of insurance products would include individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, disability insurances of all types, annuities or other timed payment vehicles, and the like." '938 Patent at 6:61–65. Similarly, the specification states that "[e]xamples of banking products would include savings-related products and services, demand deposit products and services, loan products and services, credit-related products, etc." '938 Patent at 6:65–7:1. Likewise, the specification states "[s]ecurities and investment products and services would include equity securities, debt securities, mutual funds, money markets, derivatives, etc." '938 Patent at 7:1–3. The specification also provides examples of "assurance products and money saving products such as information on warranty plans (e.g., home, automobile, electronics, etc.); discount clubs or programs (e.g., dental, travel, etc.); extended warranty plans; and the like." '938 Patent at 14:44–48. Accordingly, the Court finds that the term "financial product[s]

[and/or] [financial] services" should be construed to mean "products, services, or plans relating to insurance, banking, securities and investment, assurance, money saving, and the like."

However, the prosecution history of a non-asserted family member, U.S. Patent No. 7,711,599 ("the '599 Patent") indicates that a coupon or discount on the price of a tangible product is not by itself a "financial product[s] [and/or] [financial] services."[5] Specifically, in distinguishing a reference that disclosed providing grocery store coupons, the patentee argued that a coupon offering "a 'discount' on the price of a tangible product" was not an offer for a financial product because the "'discount' cannot be characterized as a financial product itself." ('599 Patent FH, Sep. 20, 2007 Response at 42). The patentee further argued that "[n]or can that 'discount' be characterized as an offering of a financial product or service. At best, it is an offering of a reduction on the price of a product to which the coupon applies." *Id.* The Court finds that this is a clear and unambiguous statement that a coupon or discount on the price of a tangible product is not—by itself—a "financial product[s] [and/or] [financial] services."

The Court further finds that the recited "financial products" does not include "pricing information." As indicated by claim 2 of the '434 Patent, "financial products information" is used to select a subset of the recited "financial products." Specifically, claim 2 recites "using a central processing unit in communication with the storage medium to select a subset of the financial products for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria[.]" This same distinction is found in claims 48 and 49 of the '434 Patent. Likewise, the specification states that "[t]he variable

---

[5] The Court finds that the arguments made during the prosecution of the '599 Patent are relevant to all of the Asserted Patents. A number of the Asserted Patents share a common specification with the '599 Patent. In addition, the applicant recognized, and argued to the Patent Office that "when a patent has the same or virtually identical disclosure as another patent, comments made during prosecution of either patent bear on the public's interpretation of like terms." (U.S. Patent No. 6,076,072 Patent Reexam FH, July 20, 2009 Response, Control No. 90/009,226).

financial information may comprise or pertain to financial product pricing information or financial product non-pricing information, or both." '938 Patent at 14:41–43. Here, the "pricing information" is not identified as a product, service, or plan, but instead is identified as information. In contrast, the specification identifies "*assurance products and money saving products* such as information on warranty *plans* (home, automobile, electronics, etc.); discount clubs or programs (dental, travel, etc.); extended warranty *plans*; and the like." *Id.* at 14:44–48 (emphasis added). Thus, the Court finds that the construction should not include "pricing information."

Turning to Plaintiffs' construction, the Court finds that it is too broad and inconsistent with the intrinsic evidence. Plaintiffs' construction provides no context or guidance on how a person of ordinary skill in the art would interpret the term "financial product." As discussed above, the specification explicitly states what types of products are considered "financial products" and provides numerous example of each of these types. While the claims are not limited to these specific examples, they do indicate to a person of ordinary skill in the art the characteristics of the recited "financial products," and establish a bound on what constitutes a "financial product."

Moreover, the prosecution history indicates that the term "financial product" is not just "any" financially-related product. Specifically, Plaintiffs' construction could arguably include "coupons" or "discounts" because they are "financially-related" to a product. As discussed above, the patentee clearly and unambiguously stated that "coupons" or "discounts" where not by themselves "financial products." Accordingly, the Court rejects Plaintiffs' construction. Finally, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The Court construes the term(s) **"financial product[s] [and/or] [financial] services"** to mean **"financially-related products, services, or plans relating to insurance, banking, securities and investment, assurance, money saving, and the like. A coupon or discount on the price of a tangible product is not a financial product or financial service by itself."**

### 17. "automatic[ally]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "automatic[ally]" | plain and ordinary meaning Alternatively: "performed by a computer" | "performed by a computer without input from a human" (limiting as used in preamble) |

### a) The Parties' Positions

Plaintiffs contend that the intrinsic evidence indicates that some human intervention is within the scope of "automatic." (Dkt. No. 114 at 15) (citing '434 Patent at 4:1–2; '938 Patent at 15:32–33, 28:44–45). Plaintiffs also argue that Figure 4 of the '434 Patent expressly identifies an embodiment where "manual input" is part of the process of "automatically inputting . . . client information . . . ." (Dkt. No. 114 at 15) (citing '434 Patent at 7:35–36, 20:42–47, 20:63–21:2, Figure 4). Plaintiffs further argue that when the patentee intended for "automatic[ally]" to be without human involvement, he claimed so expressly. (Dkt. No. 114 at 15) (citing '434 Patent at claims 1 and 84; '744 Patent at claim 1; '938 Patent at claim 1). According to Plaintiffs, Defendants either inject a "without input from a human" limitation where none is claimed, or render the claims unintelligible. (Dkt. No. 114 at 16).

Plaintiffs further argue that the term "automatically" in the preambles of the '434 Patent is not limiting. (*Id.*). Plaintiffs contend that the limitations of the claims set out a stand-alone method to prepare client communications. (*Id.*). According to Plaintiffs, the limitations do not

mandate defining the type of "client communications" that will be prepared. (*Id.*).

Defendants did not properly present arguments regarding the construction of this term. (Dkt. No. 116 at 3-4).

For the following reasons, the Court finds that the term **"automatic[ally]"** should be construed to mean **"performed by a computer without input from a human."** The Court further finds that the preamble should be limiting when the term **"automatic[ally]"** appears in it.

### b) Analysis

The term "automatic[ally]" appears in asserted claim 1 of the '184 Patent. The Court notes that the term "automatically" also appears in the preamble of claims 2, 21, 22, 48, and 49 of the '434 Patent; claims 1, 52, and 226 of the '938 Patent; claims 1, 28, and 29 of the '744 Patent; and claims 1 and 30 of the '184 Patent. The Court finds that the term is used in three different contexts, but notes that the term is used consistently and is intended to have the same meaning in each claim.

Specifically, the Court finds that in each situation the claims language indicates that "automatically" refers to "performed by a computer." The claims all generally relate to a computer selecting and presenting products to a client. Consistent with the claims, the specification states that the present invention "relates to apparatus and methods for marketing such products in a fully automated or significantly automated manner to achieve high volumes of transactions and sales in a short period of time." '434 Patent at 1:9–13. The specification further discloses a computer system as the apparatus that provides the automation. '434 Patent at 6:1–14. Accordingly, the Court finds that "automatically" should be construed to mean "performed by a computer."

Furthermore, the Court finds that the patentee clearly and unambiguously argued that

"automatically" requires "without input from a human." Specifically, during the prosecution of the '599 Patent, the applicant argued that "[t]he present claims are directed to a continuous method that considers client and financial data, determines whether to offer a product for a specific entity, outputs an offer for the determined product, and then moves on to the next client, all these steps *without input from an agent.*" ('599 Patent FH, Feb. 19, 2009 Response at 37) (emphasis added).[6] The applicant characterized the prior art as requiring "a human (i.e., not a processor)" for choosing an actual insurance policy. (*Id.*) The applicant further stated that "[a]t every interaction with Ryan's system, the user is continually providing input to the processor throughout Ryan's process." (*Id.*)

Moreover, the examiner identified this process as the reason for allowance for ten different family members by stating that "[t]he present invention is directed to methods and systems for considering client and financial data, determines [sic] whether to offer a product for a specific entity, outputs [sic] an offer for the determined product, and then moves [sic] on to the next client, these steps are performed without input from an agent." ('317, '599, '867, '230, '632, and '435 Patents FH, Aug. 15, 2012, Feb. 17, 2010, Apr. 27, 2010, June 21, 2010, Oct. 16, 2013, and Apr. 7, 2014, Notices of Allowance). Accordingly, the Court finds that a person of ordinary skill in the art would understand that "automatically" means "without input from a human." This is consistent with the specification that states the steps of the claimed invention are performed "in a fully automated or significantly automated manner" and "with little or no human intervention." '434 Patent at 1:6–13, 4:1–2.

---

[6] The '599 Patent is a continuation of U.S. Patent 6,076,072, which is a continuation-in-part of the '434 Patent. During prosecution, the applicant argued that "[t]he present application is a continuation-in-part of U.S. Patent 5,987,434. Applicant demonstrates here the reasons by which the present, rejected claims are also distinct from Ryan '085, for reasons that are largely similar to those urged previously to overcome Ryan '402 during prosecution of U.S. Patent 5,987,434." ('599 Patent FH, Feb. 19, 2009 Response at 35).

With this in mind, the Court turns to the issue of whether the preamble is limiting. In the "Description of the Related Art" section, the specification discusses "known automated systems" that "have been subject to a number of important limitations and drawbacks." '434 Patent at 2:63–64. The specification states that these known systems "are limited in their ability to process large volumes of prospective client communications," which "is attributable in large part to their requirement for human input and decision making as a necessary part of their operation, and because of the relatively unsophisticated nature of the known systems." '434 Patent at 3:21–26. The specification concludes this section by stating that "[a]ll of these methods and systems have been limited in that they require a substantial amount of human involvement." '434 Patent at 3:28–29.

With this background, the specification turns to the apparatus and methods of the present invention and states that they "provide a marked departure from known financial product marketing and sales systems, for example, in that they allow for the virtually complete automation of the tasks traditionally performed by agents and telemarketers in transacting such marketing and sales." '434 Patent at 3:62–4:1. The specification adds that they can do this "[a]utomatically, with little or no human intervention and with essentially no time delays." '434 Patent at 3:62–4:3.

In light of this intrinsic evidence, a person of ordinary skill in the art would understand that it is the "automatically" limitation that provides the "marked departure" from the prior art problem of requiring human intervention. *Catalina Mktg. Int'l v. Coolsavings,com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[W]hen reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation.") Accordingly, the Court finds that the preamble is limiting because the term "automatically" is "necessary to

give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999).

This is further confirmed by the prosecution history discussed above. Specifically, the patentee explicitly argued that "[t]he present claims are directed to a continuous method that considers client and financial data, determines whether to offer a product for a specific entity, outputs an offer for the determined product, and then moves on to the next client, all these steps *without input from an agent.*" ('599 Patent FH, Feb. 19, 2009 Response at 37) (emphasis added). Likewise, the examiner identified this process as the reason for allowance for ten different family members. ('317, '599, '867, '230, '632, and '435 Patents FH, Aug. 15, 2012, Feb. 17, 2010, Apr. 27, 2010, June 21, 2010, Oct. 16, 2013, and Apr. 7, 2014, Notices of Allowance).

Plaintiffs argue that when the applicant intended for "automatic[ally]" to be without human involvement, he claimed so expressly. (Dkt. No. 114 at 15). Plaintiffs contend that conversely, when the patentee did not intend to exclude "human intervention," no reference was made to it. (*Id.* at 16). The Court disagrees and finds that Plaintiffs' argument ignores the prosecution history and the statements made in the specification. Accordingly, for the reasons discussed above, the Court finds that the applicant clearly and unambiguously disclaimed "input from a human." That said, the disclaimer does not mean that a human cannot initially set-up or program the system, it only means that there is no input from a human when performing the elements recited in the claims.

### c) Court's Construction

The Court construes the term **"automatic[ally]"** to mean **"performed by a computer without input from a human."** The Court further finds that the preamble is limiting when the term **"automatic[ally]"** appears in it.

### 18. "financial" when used in the preamble

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "financial" when used in the preamble | Preamble is not limiting | "financial" in the preamble is limiting on the claims |

### a) The Parties' Positions

Plaintiffs contend that in cases where the term "financial" appears only in the preamble of the asserted claims, there is a presumption that the term is not limiting. (Dkt. No. 114 at 21). Plaintiffs argue that the limitations in the body of the claims of the '184 Patent set forth the claimed inventions. (*Id.*). Plaintiffs further contend that terms in the preamble like "financial" are not referenced in the body and are not needed to "give life" to the claims. (*Id.*) (citing '184 Patent at claim 1).

Defendants did not properly present arguments regarding the construction of this term. (Dkt. No. 116 at 3-4).

For the following reasons, the Court finds that the preamble should be limiting when the term **"financial"** appears in it.

### b) Analysis

The term "financial" appears in the preamble of asserted claims 1, 2, 22, and 48 of the '434 Patent; asserted claims 1 and 184 of the '938 Patent; asserted claims 1, 28, and 29 of the '744 Patent; and asserted claim 1 of the '184 Patent. The Court finds that the use of the term "financial" in the preamble is consistent and is intended to have the same meaning in each claim. The Court further finds that the preamble is limiting when the term "financial" appears in it. The '184 Patent specification only describes marketing of "financial" products and refers to "the present invention" as being directed to marketing of financial products. For example, the '184 Patent states that "[i]n accordance with the invention, an apparatus and method are provided for

automatically preparing client communications pertaining to one or more financial products, and/or financial services, and/or financial plans for clients." '184 Patent at 5:44–47. In addition, a person of ordinary skill in the art would find that the only products or services discussed in the specification are financial products and services. *See, e.g.,* '184 Patent at 11:23–26, 12:7–41, 13:30–14:25, 16:46–17:4, 18:44–22:55, 25:21–27:31, Figures 8–12, 17, and 19.

The Court also finds the specifications of patents to which the '184 Patent claims priority similarly state "[t]he present invention relates to apparatus and methods for marketing financial products such as individual insurance policies," and that "[t]he present invention relates to methods and apparatus for automatically preparing financial product and/or financial service-related communication . . . ." '434 Patent at 1:7–9; '072 Patent at 1:13–15. When "a patent thus describes the features of 'the present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). Accordingly, the Court finds that in this instance the specification limits the claims to financial products or services. Therefore, the Court finds that the preamble is limiting because the term "financial" is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999).

### c) Court's Construction

The preamble is limiting when the term **"financial"** appears in it.

### 19. "plan"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "plan" | plain meaning | "one or more financial products or services aimed at achieving one or more objectives of the client" |

### a) The Parties' Positions

Plaintiffs contend that the specification clearly and unambiguously provides that "[t]he

term 'plan' is used in its broad sense to include a plan which may incorporate one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client." (Dkt. No. 114 at 22) (citing '938 Patent at 7:3–7). According to Plaintiffs, "plan" may "include a plan which may incorporate . . . products or services . . . ." (*Id*.).

Plaintiffs further argue that the specification's explanation that a plan "may incorporate one or more financial products [or] services" makes sense in the context of the patent claims. (Dkt. No. 114 at 22). Plaintiffs further contend that claim 22 of the '434 Patent expressly claims "at least one plan comprising a plurality of the financial products," whereas claim 27 of the '632 Patent makes no reference to "financial products," but instead only requires that "the plan information include[] a plurality of products." (*Id*.). Plaintiffs argue that the specification's explanation of a "plan" undermines any notion that "the specification . . . contain[s] 'expressions of manifest exclusion or restriction, representing a clear disavowal'" of "plans" beyond simply "financial products or services." (*Id*.). (quoting *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1306 (Fed. Cir. 2011)).

Defendants did not properly present arguments regarding the construction of this term. (Dkt. No. 116 at 3-4).

For the following reasons, the Court finds that the term **"plan"** should be construed to mean **"one or more financial products or services aimed at achieving one or more objectives of the client."**

### b) Analysis

The term "plan" appears in asserted claims 22, 69, and 122 of the '434 Patent; and asserted claims 1, 7, 17, and 22 of the '632 Patent. The Court finds that the term is used

consistently in the claims and is intended to have the same meaning in each claim. The specification states that "the term 'plan' is used in its broad sense to include a plan which may incorporate one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client." '744 Patent at 6:50–54. The specification further states that "[f]or convenience and ease of explanation, the term 'financial products' as used herein below may refer to financial products and/or financial services and/or financial plans, and combinations of these." '744 Patent at 6:54–57.

The Court finds that both of these definition reference "financial products," not just "products." The Court further finds that the context of where the definition occurs provides insight on the meaning of "plan." Specifically, the definition of "plan" is contained within the paragraph defining "financial products." '744 Patent at 6:36–57. The definition is preceded by the definition of financial products and is followed by a clarification that the term "financial products" can refer to financial products, services, or plans. '744 Patent at 6:36–57. Accordingly, the Court finds that one of ordinary skill in the art would understand plan to mean "one or more financial products or services aimed at achieving one or more objectives of the client."

Regarding Plaintiffs' argument that the recited "plan" can include any plan, the Court disagrees. For the same reasons discussed above, the Court finds that the '632 Patent specification limits the claims to "financial products" through repeated references to "the present invention" in the same way as the '317 Patent. '632 Patent at 1:32–34, 3:53–4:3, 16:16–17:67, Figures 5–9, 14. Accordingly, the Court rejects Plaintiffs' interpretation that the plain and ordinary meaning of "plan" can mean any plan.

### c) Court's Construction

The Court construes the term **"plan"** to mean **"one or more financial products or**

**services aimed at achieving one or more objectives of the client.”**

### 20. “products [or services]”

| Disputed Term | Plaintiffs’ Proposal | Defendants’ Proposal |
|---|---|---|
| “products [or services]” | plain and ordinary meaning | (see above, regarding “financial product[s] [and/or] [financial] services”) |

#### a)  The Parties’ Positions

Plaintiffs argue that nothing in the intrinsic record suggests that “products [or services]” is used in anything but in its plain and ordinary sense. (Dkt. No. 114 at 23) (citing ’317 Patent at claim 1; ’435 Patent at claims 5 and 28). Plaintiffs also argue that other courts agree that the term requires no construction. (Dkt. No. 114 at 23-24). Plaintiffs further contend that Defendants’ construction should be rejected for the same reasons discussed above for the term “financial products.” (*Id*. at 24). Plaintiffs further argue that Defendants’ construction is also inconsistent with the intrinsic record. (*Id*. at 24). Plaintiffs contend that the claims of the ’317 Patent and the ’435 Patent make no reference to “financial,” and that the ’184 Patent refers only to “financial” in the non-limiting preamble. (*Id*.).

Plaintiffs also argue the intrinsic record confirms that “products or services” are not limited to financial products or services. (*Id*.) (citing ’938 Patent at 1:18–19, 3:48–51, 7:39, 7:53–55; ’184 Patent at 1:21–22). Plaintiffs contend that these references confirm that the term is not limited to merely financial products or services. (Dkt. No. 114 at 24). Plaintiffs further contend that during prosecution of the ’317 Patent and ’435 Patent, the applicant distinguished the inventions from claims directed to “financial products.” (*Id*.). Plaintiffs argue that the applicant explained that “the claim term ‘product data’ refers to financial or other products,” and the examiner allowed the application with that understanding. (*Id*.) (citing Dkt. No. 114-24 at 4 (Jun. 25, 2012 ’317 Remarks)). Plaintiffs further argue that the applicant repeated the comment

after allowance of the base claims, when adding more dependent claims. (Dkt. No. 114 at 24) (citing Dkt. No. 114-25 at 4 (Aug. 28, 2012 '317 Remarks)). Plaintiffs contend that the applicant also amended the abstract to the '317 Patent and titles of the '317 Patent and '435 Patent to remove references to "financial products," explaining that the amendments were made "to better correspond to the claims of the current application" and "to more closely match the claim language." (Dkt. No. 114 at 25-26) (citing Dkt. No. 114-26 at 4 (Apr. 26, 2012 '317 Remarks); Dkt. No. 114-27 at 2 (Apr. 6, 2012 '317 Remarks); Dkt. No. 114-28 at 11 (Feb. 24, 2014 '435 Remarks)).

Defendants did not properly present arguments regarding the construction of this term. (Dkt. No. 116 at 3-4).

In their reply, Plaintiffs argue that the specifications refer to "products or services, such as financial products and/or financial service[s] …." (Dkt. No. 118 at 12) (citing '938 Patent at 1:18–19; '184 Patent at 1:21–22). Plaintiffs also contend that the specifications broadly describe using the claimed inventions to generate communications for "local utilities," "retail institution[s] or any other entit[ies] that ha[ve] a large client database," and "middle to upper income individuals who comprise an important market segment for a wide range of products and services." (Dkt. No. 118 at 12-13) (citing '938 Patent at 3:48–51, 7:39, 7:53–55). According to Plaintiffs, these references confirm that "products or services" should not be limited to financial products or services.

For the following reasons, the Court finds that the term **"products [or services]"** should be construed the same as **"financial product[s] [and/or] [financial] services."**

### b) Analysis

The term "products [or services]" appears in asserted claims 1 and 4 of the '184 Patent;

asserted claims 1, 9, 25, and 52 of the '317 Patent; and asserted claims 3 and 27 of the '632 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds the intrinsic evidence indicates that the term "product" should be construed the same as "financial product." Specifically, the '317 Patent opens with the statement that "[t]he present invention relates to apparatus and methods for marketing financial products such as individual insurance policies." '317 Patent at 1:32–34. Moreover, the entirety of the "Description of the Related Art" discusses marketing of "[f]inancial products such as life insurance products." '317 Patent at 1:38–3:51. To that end, each of the three listed "Objects of the Invention" relates to "transacting financial product marketing." '317 Patent at 3:53–4:3.

Similarly, the '184 Patent states that "[i]n accordance with the invention, an apparatus and method are provided for automatically preparing client communications pertaining to one or more financial products, and/or financial services, and/or financial plans for clients." '184 Patent, 5:44–47. In addition, a person of ordinary skill in the art would find that the only products or services discussed in the specification are financial products and services. *See, e.g.,* '184 Patent at 11:23–26, 12:7–41, 13:30–14:25, 16:46–17:4, 18:44–22:55, 25:21–27:31, Figures 8–12, 17, and 19. Accordingly, the Court finds that there is no support in the intrinsic records for anything other than products meaning "financial products." *Verizon Servs. Corp.,* 503 F.3d at 1308 ("[A] patent describes the features of 'the present invention' as a whole, this description limits the scope of the invention.").

Plaintiffs contend that the claims of the '317 Patent and '415 Patent make no reference to "financial," and that the '184 Patent refers only to "financial" in the preamble. (Dkt. No. 114 at 24). Although this statement is true, it ignores the well-established principle that claims are not

interpreted in a vacuum. *Demarini Sports v. Worth*, 239 F.3d 1314, 1327 (Fed. Cir. 2001) ("We note that claim terms are not construed in a vacuum. Rather, to interpret claim terms we look to all of the intrinsic evidence as it pertains to the terms in question."). Here, the intrinsic evidence indicates to a person of ordinary skill in the art that the recited "product" is referring to a "financial product." Indeed, there is not a single non-financial product disclosed or mentioned in the specification.

The Court is also not persuaded by Plaintiffs' contention that during prosecution of the '317 Patent and '435 Patent, the applicant expressly distinguished the inventions from claims directed to "financial products." According to Plaintiffs, the applicant explained that "the claim term 'product data' refers to financial or other products," and the examiner allowed the application with that understanding. (Dkt. No. 114 at 24). Plaintiffs further note that the applicant repeated the comment after allowance of the base claims, when adding more dependent claims, which the examiner again approved. (*Id.*).

Reviewing the prosecution history, the Court finds that the applicant referenced language that was referring to specific examples of life insurance products, and not the larger class of "financial products." Specifically, the specification states that "[e]xamples of life insurance would include individual term and permanent life insurance instruments such as whole life, universal life, level and decreasing term life insurance, and the like. It is to be understood, however, that the invention is not necessarily limited to these products." '317 Patent at 6:16–21. When read in its proper context, a person of ordinary skill in the art would understand that this statement is not limiting the products to life insurance products.

Moreover, even if this statement is purported to show that the applicant was attempting to expand the claims beyond financial products, the Court finds that the applicant's statement is

contrary to what he clearly identified as the invention. The Federal Circuit has held that where the specification "clearly identifies what [the] invention is, an expression by an applicant during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight." *Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1319 (Fed. Cir. 2006); *see also Biogen, Inc. v. Berlex Labs.*, Inc., 318 F.3d 1132, 1140 (Fed. Cir. 2003) ("Representations during prosecution cannot enlarge the content of the specification."). Accordingly, the Court rejects Plaintiffs' argument that the applicant should be allowed to expand the scope of the claims sixteen years after the indicated priority date.

Plaintiffs also contend that the specifications refer to "products or services, such as financial products and/or financial service[s] …." (Dkt. No. 118 at 12) (citing '938 Patent at 1:18–19; '184 Patent at 1:21–22). According to Plaintiffs, the use of "such as" demonstrates that that financial products or services are merely examples of the broader category of products or services. The Court disagrees that "such as" expands the scope of the claims to any products or service.

Plaintiffs also contend that the specifications broadly describe using the claimed inventions to generate communications for "local utilities," "retail institutions," and "middle to upper income individuals." (Dkt. No. 118 at 12-13). According to Plaintiffs, these references confirm that the term is not limited to merely financial products or services. Again, the Court disagrees. Regarding the "local utilities" reference, the specification is not referring to the recited "product," but instead is providing an example of a "host vehicle." '938 Patent at 7:30–46. The reference to "middle to upper income individuals" is in the context of delivering communications to a particular audience, and is not a description of the recited "product." '938 Patent at 3:46–51. The reference to "retail institutions" is in the context of accessing a database,

and does not describe the recited "product." '938 Patent at 34: 13-16).

### c) Court's Construction

The Court construes the term **"products [or services]"** the same as **"financial product[s] [and/or] [financial] services."**

### 21. "means . . . for using"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means ... for using the client information, the [financial / life insurance] products information [including the non-price product information], [the plans] and the decision criteria to select a subset of the [financial products / life insurance products / plans]" | **Function:** using the client information, the [financial / life insurance] products information [including the non-price product information], [the plans] and the decision criteria to select a subset of the [financial products / life insurance products / plans] **Structure:** network server processor specifically programmed to implement the virtual agent module disclosed in Fig. 5, 6, 7, 8, 9 or 9:46-14:6, and equivalents thereof | **Function:** using the client information, the [financial / life insurance] products information [including the non-price product information], [the plans] and the decision criteria to select a subset of the [financial products / life insurance products / plans] for each of the clients appropriate for that client[, the subset of the plans including at least one plan comprising a plurality of the financial products] **Structure:** a processor programmed to perform [Steps A-I, depicted in Fig. 5 of the '434 Patent] |

### a) The Parties' Positions

Plaintiffs contend that Defendants' construction is too limiting because it would require an infringing system to execute each of the algorithms disclosed in Figures 5, steps A–I, including analyzing data on a real-time basis. (Dkt. No. 114 at 29). Plaintiffs argue that the claimed structure consists of a network server processor specifically programmed to implement the virtual agent module, and the specification makes clear that Figure 5 is merely "illustrative example[]" of functions that can be performed by the module. (*Id.*) (citing '434 Patent at 9:66–10:2).

Plaintiffs further argue that Defendants' general reference to a "processor" is improper.

(Dkt. No. 114 at 29). Plaintiffs contend that in means plus function in which the disclosed structure is a processor programmed to carry out an algorithm, the disclosed structure is a special purpose processor programmed to perform the disclosed algorithm. (*Id.* at 29-30).

Defendants did not properly present arguments regarding the construction of this phrase. (Dkt. No. 116 at 3-4).

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The Court further finds that the recited function is "using the client information, [the life insurance products information]/[the financial products information including the non- price product information]/[the financial products information, the plans], and the decision criteria to select a subset of the [life insurance products]/[financial products]/[plans] for each of the clients appropriate for that client[, the subset of the plans including at least one plan comprising a plurality of the financial products]."

Turning to the corresponding structure, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "Virtual Agent module." '434 Patent at 6:10–11, 7:14–25. The specification further states that "FIG. 5 is a flow chart diagram illustrating the Virtual Agent™ module of the preferred embodiment and method of the invention." *Id.* at 5:4–6. The specification also states that Figures 6–9 provide additional "specific examples" of the implementation of the algorithm disclosed in Figure 5. *Id.* at 7:7–23.

Accordingly, the Court turns to these flow charts to determine the steps the processor is programmed to perform.

As an initial matter, Plaintiffs contend that their construction ensures that the term includes all means for performing the function by reciting "virtual agent module disclosed in Fig[s]. 5-9 or 9:46-14:6." The Court finds Plaintiffs' construction fails to identify the specific steps the processor is programmed to perform and would be unhelpful to a jury. Moreover, Plaintiffs' construction is open ended and inconsistent with the well-established rule that, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Accordingly, the Court does not adopt Plaintiffs' structure because it fails to identify the corresponding structure with the required specificity.

Referring to Figure 5, the specification states that in Step A, "the production and scheduling module operates according to a set of predetermined criteria to determine the ordering and scheduling of the system operation and job performance." '434 Patent at 18:35–39. Thus, the Court finds that in Step A, the processor is programmed to run jobs in order of a predetermined criteria. The specification further states that in Step B, "the Virtual Agent module retrieves the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records." '434 Patent at 10:23–25. Thus, the Court finds that in Step B the processor is programmed to retrieve the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records.

The specification further states that in Step C, "the Virtual Agent module retrieves or otherwise receives a set of client records from the client database." '434 Patent at 10:27–31.

Thus, the Court finds that in Step C, the processor is programmed to retrieve or otherwise receive a set of client records from the client database. The specification further states that in Step D, "the module identifies, evaluates and analyzes the needs of the client among other reasons for plan(s) and product(s) selection of a given type." '434 Patent at 10:43–45. Thus, the Court finds that in Step D, the processor is programmed to identify, evaluate, and analyze the needs of the client.

The specification further states that in Step E, "the module analyzes the client information for that record, including demographic information." '434 Patent at 10:49–51. Thus, the Court finds that in Step E, the processor is programmed to analyze the client information for that record, including demographic information. The specification further states that in Step F, "the module uses the analyzed client information and applies it against the decision making criteria." '434 Patent at 10:52–54. Thus, the Court finds that in Step F, the processor is programmed to use the analyzed client information and apply it against the decision making criteria.

Regarding Step G, the specification states that "the module selects the product or products which satisfy the decision making criteria being employed in the module." '434 Patent at 12:20–23. The specification also states that "[u]nder this Step G, the Virtual Agent™ module draws from the available product pool the most appropriate product to fit each plan selected as a candidate in Step F." '434 Patent at 12:23–25. Accordingly, the Court finds that in Step G, the processor is programmed to select the product or products which satisfy the decision making criteria being employed. The specification further states that in Step H, "the module selects a specific amount or amounts of coverage to propose under each plan. This decision is based on the information as compile in Step D, E, F, and G as described above." '434 Patent at 13:48–52.

Thus, the Court finds that in Step H, the processor is programmed to select a specific amount or amounts of coverage to propose based on the information as compiled in Step D, E, F, and G as described above.

Finally, the specification states that in Step I, "the module analyzes the past or current performance on a real-time basis of various sale programs." '434 Patent at 12:54–57. The specification further states that "[the module] identifies on a real-time basis who is buying on any geographic or any demographic basis. This step involves determining what the individual client is most likely to buy, making the end users aware of that fact, recommending changes, and if given permission, or if appropriately coded, automatically implementing the changes, which may occur even during the running of the module." '434 Patent at 12:57–64. The Court finds that the later portion of the specification's description of Step I is a preferred embodiment, and is not clearly linked to the function recited in the claims. Similarly, the Court's construction captures the recited steps that are clearly linked to the function recited in the claim for the embodiments illustrated in Figures 6–9. Thus, the Court finds that in Step I, the processor is programmed to analyze the past or current performance on a real-time basis of various sale programs.

Plaintiffs argue that the claimed structure consists of a network server processor specifically programmed to implement the virtual agent module. (Dkt. No. 114 at 29). According to Plaintiffs, a general reference to a processor is improper. (*Id.*). The Court's construction is not a general reference a processor, as Plaintiffs contend. Instead, the Court's construction explicitly states that the "processor [is] programmed to perform the steps of . . . ." The form of the Court's construction is nearly identical to the form of the construction provided by the Federal Circuit in *WMS Gaming Inc. v. International Game Tech.,* 184 F.3d 1339 (Fed. Cir. 1999), the case cited

by Plaintiffs in their brief. (Dkt. No. 114 at 30). Specifically, the Federal Circuit held that "the disclosed structure is a microprocessor programmed to perform the algorithm illustrated in Figure 6. In other words, the disclosed structure is a microprocessor programmed to assign a plurality of single numbers to stop positions such that: 1) the number of single numbers exceeds the number of stop positions; 2) each single number is assigned to only one stop position; 3) each stop position is assigned at least one single number; and 4) at least one stop position is assigned more than one single number." *Id.* at 1349. Accordingly, Plaintiffs' proposed "network server processor specifically programmed to" language is unnecessary and could potentially confuse the jury.

### c) Court's Construction

The Court construes the phrase **"means . . . for using"** as follows:

**<u>Function</u>: The Court finds that the function is using the client information, [the life insurance products information]/[the financial products information including the non-price product information]/[the financial products information, the plans], and the decision criteria to select a subset of the [life insurance products]/[financial products]/[plans] for each of the clients appropriate for that client[, the subset of the plans including at least one plan comprising a plurality of the financial products].**

**<u>Corresponding Structure</u>: The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) run jobs in order of a predetermined criteria; (B) retrieve the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records; (C) retrieve or otherwise receive a set of client records from the client database; (D) identify, evaluate and analyze the needs of the client; (E) analyze the client information for that record, including demographic**

information; (F) use the analyzed client information and apply it against the decision making criteria; (G) select the product or products which satisfy the decision making criteria being employed; (H) select a specific amount or amounts of coverage to propose based on the information as compiled in Step D, E, F, and G as described above; (I) analyze the past or current performance on a real-time basis of various sale programs.

**22. "means for preparing," "means for automatically preparing," "means for automatically generating,"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client" | **Function:** preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client<br>**Structure:** network server processor specifically programmed to implement sales presentation and output module disclosed in Fig. 10, or 14:7-18:7, and equivalents thereof | **Function:** preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client<br>**Structure:** a processor programmed to perform [Steps A-E, depicted in Fig. 10 of the '434 Patent] |
| "means for automatically preparing [a / a plurality of] [customized] mass marketing communication[s]" | **Function:** automatically preparing [a / a plurality of] [customized] mass marketing communication[s]<br>**Structure:** network server processor specifically programmed to implement processor module disclosed in Figs. 7-12, or 18:10-23:64, and equivalents thereof | **Function:** automatically preparing mass marketing communications comprising offerings for said particular type of financial product or service or variant thereof to said selected consumer entity<br>**Structure:** a processor programmed to perform [Steps A-E, depicted in Fig. 10 of the '434 Patent] |
| "means for automatically generating [one or more] replies [to / for] at least some of [the / said] responses [or subsequent responses]" | **Function:** automatically generating [one or more] replies [to / for] at least some of [the / said] responses [or subsequent responses]<br>**Structure:** network server processor specifically programmed to implement processor module disclosed in Figs. 7-12, or 18:10-23:64, and equivalents thereof | **Function:** automatically generating replies to at least some of the responses<br>**Structure:** a processor programmed to perform the steps of: (1) receive a client response; (2) review and analyze the response; (3) determine whether a reply is needed; (4) generate a reply when it is determined that one is needed |

### a)  The Parties' Positions

Plaintiffs argue that the parties largely agree on the claimed functions, but differ on some aspects of the corresponding structure. (Dkt. No. 114 at 30). Plaintiffs contend that for the "automatically generating" phrase, they agree with Defendants' structure except for their reference to a general "processor." (*Id.*). Plaintiffs further contend that Defendants' proposals for the other phrases are improper for the same reason. (*Id.*). Plaintiffs also argue that Defendants' characterization of Step A for the "means for preparing" phrases are too limiting. (*Id.* at 31). Plaintiffs contend that other disclosures in the specification provide a broader formulation of Step A, referring to "retriev[ing] work to be performed from other parts of the system." (*Id.*) (citing '434 Patent at Fig. 10). Plaintiffs argue that the structure should be construed with reference to the structure, the sales presentation, and output module. (*Id.*). According to Plaintiffs, the specification clearly links the sales presentation and output module to the claimed functions. (*Id.*) (citing '434 Patent at 14:7–18:7, Figures 1-3, 10).

Defendants did not properly present arguments regarding the construction of these phrases. (Dkt. No. 116 at 3-4).

### b)  Analysis

Having reviewed the claims, the Court finds that the phrases are governed by 35 U.S.C. § 112, ¶ 6. For the "means for preparing" phrase, the parties have identified the recited function as indicated in the table above. The Court agrees that this is the function recited in the claims. For the "means for automatically preparing" phrase, the Court finds that the recited function is automatically preparing [a / a plurality of] [customized] mass marketing communication[s]. Turning to the corresponding structure for these phrases, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir.

2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "output module." '434 Patent at 6:10–11, 7:14–25. The specification further states that "FIG. 10 is a flow chart diagram illustrating the output module of the preferred embodiment and method of the invention." '434 Patent at 15:4–6. The specification of the '184 Patent also states that Figure 18 is a flow chart diagram of the automatic reply system module. '184 Patent at 30:11–17. Accordingly, the Court turns to these flow charts to determine the steps the processor is programmed to perform.

Referring to Figure 10 of the '434 Patent, the specification states that in Step A, "the output module retrieves work to be performed from other parts of the system." '434 Patent at 15:6–8. The specification further states that "[a]s part of Step A, the output module retrieves instructions which would be used in preparing the presentation letter or other communications output." '434 Patent at 15:14–16. Plaintiffs argue that this description is overly limiting. (Dkt. No. 114 at 31). The Court disagrees. The patentees invoked means-plus-function claiming and 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure     described in the specification and equivalents thereof.'" *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (citing 35 U.S.C. § 112, ¶ 6). Accordingly, the Court finds that in Step A the processor is programmed to retrieve work to be performed from other parts of the system, that includes retrieving instructions which would be used in preparing the presentation letter or other communications output.

The specification further states that in Step B, "client files are grouped by user, or by the sales program to be used, or by other criteria specified by the system user." '434 Patent at 15:23–25. Thus, the Court finds that in Step B, the processor is programmed to group client files by

user, or by the sales program to be use, or by other criteria specified by the system user. The specification further states that in Step C, "the output module receives a client record for processing" '434 Patent at 15:33–34. Thus, the Court finds that in Step C, the processor is programmed to receive client record for processing. In addition, Step C illustrated in Figure 10 states "Retrieves Next Client Record." '434 Patent at Figure 10. Thus, the Court finds that in Step C, the processor is programmed to retrieve or otherwise receive client record for processing.

The specification further states that in Step D, "the output module analyzes and evaluates the client information from the client record, the corresponding output from the Virtual Agent module for that client record, and other data or information needed to construct the communication." '434 Patent at 15:33–38. Thus, the Court finds that in Step D, the processor is programmed to analyze and evaluate client information from the client record, the corresponding output for that client record, and other data or information needed to construct the communication.

Finally, the specification states that in Step E, "the output module uses the instructions for preparation of the communication, together with the data and information from Step D, to prepare the presentation or other communication." '434 Patent at 15:40–45. Thus, the Court finds that in Step E, the processor is programmed to use the instructions for preparation of the communication, together with data and information from Step D, to prepare the presentation or other communication. Figure 10 also clearly indicates that the processor works in conjunction with output devices, such as printers, modem, display, and voice recognition technology. '434 Patent at 6:7–9, 8:21–26, Figure 10, Step H.

Regarding the "automatically generating" phrase, the Court finds that the recited

function is automatically generating [one or more] replies [to / for] at least some of [the / said] responses [or subsequent responses]. Turning to the corresponding structure, the Court finds that Figures 18 and 19 of the '938 and '184 Patents disclose the corresponding structure. Specifically, the specification states the following:

> The invention provides a system that includes software that automatically generates a reply to responses received from clients responding to a mass communication. The invention may better be understood with reference to FIG. 18, a flow diagram illustrating a preferred embodiment of the invention. In this particular non-limiting illustrative embodiment, an initial mass communication is mailed to a plurality of clients (up to tens or hundreds of thousands, or even millions) in step 1000. The mass communication elicits client responses 1010, and these are (preferably electronically) read into a logic system 1020 through an appropriate input device. The logic system 1020 reviews the client response, analyzes the response 1030 and then determines whether a reply letter must be generated 1040. For example, if the client response relates to a solicitation for life insurance, in which several different options were presented, and the client requests further information on either one of the options, or requests an additional quotation, then the system logic 1020 and 1030 recognizes the client response. If the client requires an additional quotation, for example, an additional letter to the client will be needed. If no communication is needed, for example if the client has made a "purchase response", then the response is routed out of the system to step 1060 where the purchase is further processed and a "thank you" letter or additional follow up is generated, as needed. On the other hand, if it is determined from the response that the client requires additional information, an appropriate letter is generated addressing the specific client's requirements. This letter is then delivered to the client 1050, by any one of a variety of means, which could be specified by the client. It is important to note that the system processes responses and automatically (preferably electronically) generates a plurality (thousands, hundreds of thousands, or millions) of replies, each directed specifically to a response from a particular client.

> Referring back to FIG. 18, the system tests whether a client has responded to a prior delivered reply in 1070. If the client has responded, the client response is again input and analyzed as discussed above. If the client has not responded, a determination is made as to whether a follow-up is needed 1080. If a follow-up is not required, the communication with the particular client is terminated. On the other hand, if a follow-up is required, the communication is processed through follow-up logic 1090 which generates a follow-up letter that is delivered 1110 to the client by

> any one of a variety of appropriate means. Once the follow-up letter is delivered, the system retains information in memory, and tests at a later date whether the client has responded 1070. If there has been no response, the system determines whether a follow-up is needed 1080.

'184 Patent at 30:11-31:3. Accordingly, the Court finds the processor is programmed to (1) receive a client response; (2) review and analyze the response; (3) determine whether a reply is needed; (4) generate a reply when it is determined that a reply is needed. Finally, for the reasons discussed above, Plaintiffs' proposed "network server processor specifically programmed to" language is unnecessary and could potentially confuse the jury.

### c) Court's Construction

The Court construes the phrase **"means for preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client"** as follows:

**<u>Function:</u> The Court finds that the function is preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client.**

**<u>Corresponding Structure:</u> The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) retrieve work to be performed from other parts of the system, which includes retrieving instructions which would be used in preparing the presentation letter or other communications output; (B) group client files by user, or by the sales program to be used, or by other criteria specified by the system user; (C) retrieve or otherwise receive client record for processing; (D) analyze and evaluate client information from the client record, the corresponding output for that client record, and other data or information needed to construct the communication; and (E) use the instructions for preparation of the communication, together with data and information**

from Step D, to prepare the presentation or other communication.

The Court construes the phrase **"means for automatically preparing [a / a plurality of] [customized] mass marketing communication[s]"** as follows:

**Function:** **The Court finds that the function is automatically preparing [a / a plurality of] [customized] mass marketing communication[s].**

**Corresponding Structure:** **The Court finds that the corresponding structure is the same as above.**

The Court construes the phrase **"means for automatically generating [one or more] replies [to / for] at least some of [the / said] responses [or subsequent responses]"** as follows:

**Function:** **The Court finds that the function is automatically generating [one or more] replies [to / for] at least some of [the / said] responses [or subsequent responses].**

**Corresponding Structure:** **a processor programmed to perform the steps of: (1) receive a client response; (2) review and analyze the response; (3) determine whether a reply is needed; (4) generate a reply when it is determined that one is needed.**

### 23. "means for communicating"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for communicating said [replies to associated consumer entities / replies to consumer entities who sent the responses / communications to said selected consumer entities]" | **Function:** communicating said [replies to associated consumer entities / replies to consumer entities who sent the responses / communications to said selected consumer entities] **Structure:** printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a network server processor specifically programmed to perform the step of sending communications to a consumer entity | **Function:** communicating said [replies to associated consumer entities / replies to consumer entities who sent the responses / communications to said selected consumer entities] **Structure:** printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a processor programmed to perform the step of sending communications to a consumer entity |

### a) The Parties' Positions

Plaintiffs contend that the parties agree on the claimed function, and largely agree on the corresponding structure. (Dkt. No. 114 at 31). Plaintiffs argue that the specification clearly links step H of Figure 13 with the sending/communicating/delivering function. (*Id.*). According to Plaintiffs, this step is described as the "output module" "present[ing] [the] output" by "printed materials, modem or electronic transfer, internet, voice response, etc." (*Id.*) (citing '938 Patent at Fig. 13). Plaintiffs further argue that the specification links the disclosure of means for delivery, including "mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically," and "human operator and voice recognition and response technology." (*Id.*). (citing '938 Patent at 44:1–4, 45:17–21, 3:45–51; 25:15–28:37, Figures 4 and 13). Plaintiffs also argue that Defendants' proposal is improperly limited to a general processor. (Dkt. No. 114 at 31).

Defendants did not properly present arguments regarding the construction of this phrase. (Dkt. No. 116 at 3-4).

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as indicated in the table above. The Court agrees that this is the function recited in the claims. Turning to the corresponding structure, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "output module." '938 Patent at 8:25–27, 9:61–64. The specification

further states that "FIG. 13 is a flow chart diagram illustrating the output module of the preferred embodiment and method of the invention." '938 Patent at 25:16–18. The specification also states that Figure 18 is a flow chart diagram of the automatic reply system module. '938 Patent at 30:58–61. Accordingly, the Court turns to these flow charts to determine the steps the processor is programmed to perform.

Referring to Figure 13 of the '938 Patent, Step H is label "Presentation Output" and incudes blocks labeled "Printed Materials, Modem or Electronic Transfer, Internet, Voice Response, Etc." The specification further indicates that the communicating means may include "mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically," as well as "human operator and voice recognition and response technology." '938 Patent at 44:1–4, 45:17–21; 13:45–51, Figures 4, 13. The parties do not dispute that this includes the recited structure. Accordingly, the Court finds that the corresponding structure is printer, modem, display, internet, electronic transfer, voice recognition technology, and equivalents thereof in conjunction with a processor programmed to perform the step of sending a responsive communication data output to a client.

Likewise, the Court finds that Figures 18 and 19 of the '938 and '184 Patents also disclose corresponding structure related to the processor. Specifically, the specification states that the "letter is then delivered to the client 1050, by any one of a variety of means, which could be specified by the client. It is important to note that the system processes responses and automatically (preferably electronically) generates a plurality (thousands, hundreds of thousands, or millions) of replies, each directed specifically to a response from a particular client." '184 Patent at 30:39–45. Accordingly, the Court finds the processor is programmed to deliver a reply or response. Finally, for the reasons discussed above, Plaintiffs' proposed "network server

processor specifically programmed to" language is unnecessary and could potentially confuse the jury.

### c) Court's Construction

The Court construes the phrase **"means for communicating said [replies to associated consumer entities / replies to consumer entities who sent the responses / communications to said selected consumer entities]"** as follows:

**Function:** **The Court finds that the function is communicating said [replies to associated consumer entities / replies to consumer entities who sent the responses / communications to said selected consumer entities].**

**Corresponding Structure:** **The Court finds that the corresponding structure is printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a processor programmed to perform the step of sending a reply to a consumer entity.**

### 24. **"means for inputting"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for inputting the client information" | **Function:** inputting the client information<br>**Structure:** disk drive, tape drive, optical scanner, bar code reader, or other scanning technology, modem, keyboard, mouse, light pen, trackball or similar pointing device, voice recognition technology, networked nonresident database, and equivalents thereof | **Function:** Agreed<br>**Structure:** modem, tape drive, disk drive, diskette drive, nonresident database, and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) reading client information from the media; (2) storing the client information in temporary storage; and (3) transferring the client information to a database |

| "means for inputting … information about [financial products], [a plurality of plans], and decision criteria" | **Function:** inputting information about [financial products], and [a plurality of plans], and decision criteria<br>**Structure:** disk drive, tape drive, optical scanner, bar code reader, or other scanning technology, modem, keyboard, mouse, light pen, trackball or similar pointing device, voice recognition technology, networked nonresident database, and equivalents thereof | **Function:** Agreed<br>**Structure:** disk drive, diskette drive, tape drive, non-resident database, optical scanner, bar code reader, modem, keyboard, mouse, light pen, trackball, voice recognition technology, and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) receiving or reading information about [financial products]/[life insurance products], [a plurality of plans], and decision criteria from an input device or media; (2) storing the [information], [plans], and decision criteria in temporary storage; and (3) transferring the [information], [plans] and decision criteria to a database. |

### a) The Parties' Positions

Plaintiffs contend that the parties agree on the claimed functions. (Dkt. No. 114 at 32). Plaintiffs argue that Defendants' proposed structure fails to account for "other scanning technology" and "similar pointing device[s]" like a mouse, light pen, or trackball. (*Id.*). Plaintiffs contend that this structure is expressly disclosed in the specification. (*Id.*). (citing '434 Patent at 8:14–17, 6:12–13, 6:46–47, 6:49–51, 8:9–12, Figures 1 & 4).

Defendants did not properly present arguments regarding the construction of these phrases. (Dkt. No. 116 at 3-4).

### b) Analysis

Having reviewed the claims, the Court finds that the phrases are governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as indicated in the table above. The Court agrees that this is the function recited in the claims. Turning to the corresponding structure for the phrase "means for inputting … information about [financial products], [a plurality of plans], and decision criteria," the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed

algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Here, the specification discloses that the algorithm for performing the function is illustrated in Figure 4. Specifically, the specification states that "[a]n example of the organization and task flow of the data input module shown in FIG. 4." '434 Patent at 8:9–10. The specification further states the following:

> The data input module of this embodiment and method inputs data into the system from one or more of the input devices for the system, such as modem 20, tape drive 22, or bar code reader 24.
> With further reference to FIG. 4, as data is inputted [sic], the data input module stores it in a temporary storage area within processor 12. If necessary or appropriate, the data is converted to a format compatible with the system. For example, as is known in the database arts, it is sometimes necessary to import or export files to convert one database format to a pre-defined database structure. In this embodiment, the data input module also may tag and identify client records as they are inputted, and perform general and routine "house keeping" tasks on the data. Once these tasks have been performed by the data input module, the properly-formatted client information is transferred to the database module.

'434 Patent at 8:38–61. As indicated above, the specification includes a processor in the structure of the inputting means, and further discloses the algorithm that performs the function in Figure 4. However, the Court finds that the algorithm does not need to include all of the steps of Figure 4. Instead, depending on the corresponding function, the processor is only required to be programmed to perform: (1) reading or receiving information; (2) storing information in temporary storage area of the processor; and (3) transferring the information to a database. Indeed, the specification indicates that the steps of "converting data to compatible format for the system" is only included "[i]f necessary or appropriate," and that "the data input module also *may* tag and identify client records as they are inputted." '434 Patent at 8:51–58 (emphasis added). Neither of these steps are required in performing the recited function. Accordingly, the Court will not include these steps in the algorithm.

Turning to the phrase "means for inputting the client information," the Court finds that

the corresponding structure is modem, tape drive, disk drive, diskette drive, non-resident database and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) reading client information from the media; (2) storing the client information in temporary storage; and (3) transferring the client information to a database. As discussed above, the specification identifies a processor in Figure 1 programmed to perform the related steps of Figure 4. Referring to Figure 1, the specification identifies the following media structure for inputting information:

> The means of inputting may vary depending on the format in which the information is available. With reference to FIG. 1, for example, information may be directly entered using keyboard 16. Diskette drives (not shown), for example, as would come as standard equipment with the types of processors noted above also may be used. In some instances, bulk lists of client records may be available by tape, in which case in which case tape drive 22 may be used. Some records are available on non-resident databases. This is increasingly the case as online networks such as the Internet gain widespread use and acceptance. In such instances, prospective client information may be received via modem 20.

'434 Patent at 7:58-8:3. The corresponding media structure is also identified in Figure 4 that states the media formats include "Modem Transfer, Tape, and Diskette, Etc." '434 Patent at Figure 4 ("Download Data" block). Thus, the Court finds that the structure includes at least these elements.

During the first reexamination, the applicant further clarified that the "means for inputting the client information" is limited to this structure because a simple keyboard entry system was not enough. Specifically, the applicant argued that "it is incontrovertible that the client information in Frenkel [the prior art] is only fed manually (i.e., by a human operator using a keyboard or scanner 1 or the like) into the computer system 2 shown in Figure 1." (Feb. 21, 2006 OA Response at 34) (Control Number 90/007498) (emphasis in original). The applicant continued that "Frenkel clearly requires some kind of human intervention in order to get individual client records into computer 2 so that they can be processed to generate reports. At a

minimum, Frenkel says absolutely nothing about " . . . automatically inputting . . . ." (*Id.*)

The applicant further argued that this distinction was crucial because:

> There can be no meaningful debate that Frenkel clearly requires human intervention (" . . . individual consideration") to review the reports to determine the cause of any input errors. Thus any fair and reasonable reading therefore of Frenkel reveals that [it] is clearly not operating " . . . without human intervention" to automatically input client records as set out in claims 1, 2.
> The distinction is crucial because, as claims 1, 2 specify, there must be at least some inputting that is <u>automatically</u> done " . . . without human intervention." This is a negative limitation which cannot be ignored for purposes of patentability and must be respected so long as it is clear.

(*Id.* at 35) (emphasis in original). The applicant concluded that "[i]t should be apparent that automatic means for inputting, which can be from a disk drive (claim 3), a tape drive (claim 4), a modem (claim 7) are not made obvious by a simple keyboard entry system such as shown in Frenkel. The latter is clearly not an input means which is 'automatically inputting' client records as set out in claim 1." (*Id.* at 42).

Finally, the prosecution history indicates that the PTO relied on the applicant's statement of requiring automatic input without human intervention in allowing the claims. Specifically, the examiner states that "[c]laims 1, 2, 8, 15, 16, 21, 22, 23, 25, 28, 35, 42, 43, 46, 48, 49, 55 and those that depend therefrom are confirmed because, but not necessarily limited as the only reason, the prior art patent and printed publications within this reexamination proceeding fail to disclose, teach or suggest, singly or in combination, the inputting means automatically inputting the plurality of client records without human intervention between input of the respective client records as the Patent Owner has argued in the remarks within this reexamination proceeding which is also incorporated herein as part of the reason for confirmation." ('434 Pat. 1st Reexam. FH, Apr. 3, 2007, Reasons for Allowance at 40) (Control Number 90/007498).

Given the prosecution history above, the Court finds that the applicant clearly and unambiguously disclaimed an apparatus that uses only a manual entry system to input client

information. Accordingly, the Court finds that the corresponding structure for the "means for inputting the client information" element is not a simple keyboard entry system. Instead, it is the identified media operating in conjunction with a processor programmed to perform the related steps identified in Figure 4.

Turning to the phrase "means for inputting information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria," the Court finds that corresponding structure is basically the structure identified by Plaintiffs, in conjunction with a processor programmed to perform the steps of: (1) receiving or reading information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria from an input device or media; (2) storing the [information], [plans], and decision criteria in temporary storage; and (3) transferring the [information], [plans] and decision criteria to a database. As discussed above, the specification identifies the processor programmed to perform the steps of Figure 4. The remaining structure is identified in the specification as follows.

The specification states that embodiments include "a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations." '434 Patent at 6:3–5. The specification further states that "each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse 22, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24." '434 Patent at 6:10–14, Figure 1. The specification further refers generally to "scanning technology," "scanners such as those commercially available for use with processor 12," and "optical scanners. '434 Patent at 8:14–17, Figure 4. The specification also discusses voice recognition technology. '434 Patent at 8:21–26. The Court further finds that these structures are linked to the claimed function. '434 Patent at 6:49–51 ("The mouse, light

pen, track ball or similar pointing device . . . comprise[] means for inputting").

The parties generally agree that these are the corresponding input devices. However, unlike the "means for inputting the client information" element, the Court finds that the "means for inputting . . . information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria" may include manual and/or automatic inputting. Indeed, the specification explicitly states that "data may be entered manually or automatically. For example, information may be entered using scanning technologies." '434 Patent at 8:9–12. The Court does not find, and Defendants did not identify, any instance in the intrinsic record where the applicant distinguished the prior art based on a manual entry system as it relates to inputting information about life insurance/financial products, [plans] . . . and decision criteria. Accordingly, the Court finds that "automatic inputting" refers to automatically inputting "client records," and does not limit the "means for inputting . . . information about life insurance/financial products, [plans] . . . and decision criteria."

### c) Court's Construction

The Court construes the phrase **"means for inputting the client information"** as follows:

**Function**: The Court finds that the function is inputting client information.

**Corresponding Structure**: The Court finds that the corresponding structure is modem, tape drive, disk drive, diskette drive, non-resident database, and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) reading client information from the media; (2) storing the client information in temporary storage; and (3) transferring the client information to a database.

The Court construes the phrase **"means for inputting . . . information about [financial**

products]/ [life insurance products], [a plurality of plans], and decision criteria" as follows:

**Function**: The Court finds that the function is inputting information about [financial / life insurance] products, [a plurality of plans], and decision criteria.

**Corresponding Structure**: The Court finds that the corresponding structure is disk drive, diskette drive, tape drive, non-resident database, optical scanner, bar code reader, modem, keyboard, mouse, light pen, trackball, voice recognition technology, and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) receiving or reading information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria from an input device or media; (2) storing the [information], [plans], and decision criteria in temporary storage; and (3) transferring the [information], [plans] and decision criteria to a database.

### 25. "means for receiving"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for receiving one or more responses to [said] [mass marketing] communications from [at least some / one or more of] [said selected] consumer entities" | **Function:** receiving responses to said communications from at least some of said consumer entities<br>**Structure:** network server processor specifically programmed to perform [Steps A-C, depicted in Fig. 15 of the '938 Patent] | **Function:** receiving responses to said communications from at least some of said consumer entities<br>**Structure:** a processor programmed to perform [Steps A-C, depicted in Fig. 15 of the '938 Patent] |

### a) The Parties' Positions

Plaintiffs contend that the parties agree on the claimed function, and largely agree on the corresponding structure. (Dkt. No. 114 at 33). Plaintiffs argue that Defendants' proposal is improperly limited to a general processor. (*Id.*). Plaintiffs also argue that the specification clearly links at least steps A-C of Figure 15 to the claimed function. (*Id.*) (citing '938 Patent at 29:19–30:14, 30:55–31:49, Figures 2, 15, 18, 20, 21).

Defendants did not properly present arguments regarding the construction of this phrase. (Dkt. No. 116 at 3-4).

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as indicated in the table above. The Court agrees that this is the function recited in the claims. Turning to the corresponding structure, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes an "administrative and support" system. '184 Patent at 8:16–17, 9:42–43. The specification further states that the administrative and support system includes a "sales and financial report and analysis module." '184 Patent at 9:49–51. The specification adds that "[a] flow chart which illustrates the organization and flow of the sales and financial report and analysis module for the preferred embodiment and method is shown in FIG. 15." '184 Patent at 28:51–53. Accordingly, the Court turns to this flow chart to determine the steps the processor is programmed to perform.

As an initial matter, Plaintiffs propose "network server processor specifically programmed to implement at least the algorithm of Fig. 15, steps A–C, and equivalents thereof." The Court finds Plaintiffs' construction fails to clarify what exactly steps A–C include. Accordingly, the Court does not adopt Plaintiffs' structure because it fails to identify the corresponding structure with the required specificity.

Referring to Figure 15 of the '184 Patent, the specification states that Step A "involves

receiving sales information based on sales of financial products actually made," '184 Patent at 28:55–57. Thus, the Court finds that in Step A, the processor is programmed to receive a response. The specification further states that in Step B "these sales results are inputted into the system, manually, by scanning, or by other methods described above which regard to the data input module." '184 Patent at 28:57–60. Thus, the Court finds that in Step B, the processor is programmed input the response into the system, manually, by scanning, or by other methods described above which regard to the data input module. The specification further states that in Step C, "these results are stored and organized in a sales database resident in the database module." '184 Patent at 28:60–61. Thus, the Court finds that in Step C the processor is programmed to store responses and organize data in a database. Finally, for the reasons discussed above, Plaintiffs' proposed "network server processor specifically programmed to" language is unnecessary and could potentially confuse the jury.

### c) Court's Construction

The Court construes the phrase **"means for receiving one or more responses to [said] [mass marketing] communications from [at least some / one or more of] [said selected] consumer entities"** as follows:

**Function:** **The Court finds that the function is receiving responses to said communications from at least some of said consumer entities.**

**Corresponding Structure:** **The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) receive a response; (B) input the response into the system, manually, by scanning, or by other methods described above which regard to the data input module; and (C) store responses and organize data in a database.**

## V.    CONCLUSION

The Court adopts the above constructions. The parties are ordered to not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury. However, the parties are reminded that the testimony of any witness is bound by the Court's reasoning in this order but any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**It is SO ORDERED.**

**SIGNED this 24th day of October, 2016.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE